## THE CITY OF ALEXANDRIA.[1]

### VEGA and others *v.* THE CITY OF ALEXANDRIA.

*(Circuit Court, S. D. New York. July 16, 1886.)*

CARRIERS — OF GOODS BY VESSEL — DAMAGE TO CARGO — LIABILITY OF VESSEL FOR NEGLIGENCE OF LIGHTER — AUTHORITY TO BIND VESSEL.

A vessel may be bound for the safe carriage of cargo before it is actually laden on board. Authority to accept delivery for and to bind the vessel may be conferred by an express grant, or the conduct and relations of the parties may establish such an apparent authority that the carrier will be estopped from denying its existence to a shipper who has been misled thereby.

Appeal from the district court for the Southern district of New York. Reported 23 Fed. Rep. 826.

Libel *in rem* by a shipper, for damage to cargo while being transported in lighter to the vessel's anchorage. The issue involved two questions: (1) Whether the accident was occasioned by the negligence of the lighter, or by perils of the sea; (2) whether the steamship was responsible for the negligence of the lighter.

*Butler, Stillman & Hubbard,* for Vega and others.

*A. Oldrian Laller,* for the City of Alexandria.

WALLACE, J. The libelant's tobacco was injured while being carried from the Caballeria wharf, Havana, to the steam-ship, on a

---

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

lighter belonging to Mendez & Co. The questions in controversy are—*First*, whether the accident was occasioned by the negligence of the lighter, or by a peril of the sea; and, *secondly*, whether the steamship is responsible for the negligence of the lighter.

As to the first question, the case for the libelants is so plain as to be almost free from doubt. Three hundred and ninety-nine bales of tobacco, very dry and slippery, were taken on the lighter, to be carried about a half mile, this being the distance from the wharf to the steam-ship, which was then lying in the harbor. They were piled in six tiers, three of which were above the gunwale, and extended eight or nine feet above, and were wholly unprotected. As the lighter proceeded under sail she encountered a slight puff of wind, which caused her to careen slightly, and 86 bales slipped off into the water. The fact that nearly a quarter of the cargo slid off into the sea, when the lighter "only tipped a little," (to quote the testimony of one of her owners,) is of itself enough to indicate that there was negligence of the rankest kind, either in putting on board much more cargo than could be safely carried on the lighter, or in failing to protect the bales by proper lashing. An attempt is made, in defense of those in charge of the lighter, to show that the cargo was loaded in the customary way practiced in Havana as to quantity, and as to the means for securing the cargo. This defense succeeded in the district court, no evidence having been introduced there on the part of the libelants to controvert the alleged usage. If this usage were shown to prevail, it would prove that the lightermen of Havana are habitually careless and reckless in the conduct of their business; and it would seem incredible that an intelligent community would tolerate, much less sanction, as an established usage, the practice of loading valuable cargoes in such a way that whenever the vessel meets a passing breeze a large part of the cargo is liable to be lost overboard. Slight evidence ought to suffice to overthrow the existence of such a usage.

Evidence has been introduced upon this appeal which satisfactorily shows that the cargo was piled upon the lighter excessively high; that, in such a trim, it could only be transported safely by a lighter not under sail, but in tow of a tug; and that it is customary at Havana to protect such a cargo by lashing the bales to the lighter.

The more debatable question is whether the lighter, while transporting the libelants' tobacco, was in the service of the steam-ship, so that delivery of the cargo to the lighter was a delivery to the steamer. The libel alleges that the libelants, on the tenth day of March, 1882, caused 399 bales of tobacco to be delivered to the steamer at Havana, for transportation to the port of New York, in good order and condition; that thereafter the steamer issued a bill of lading to the libelants, agreeing to convey the tobacco to the city of New York, and deliver it to the libelants in like good order and condition; and that there was a breach of the agreement, in that 86 of those bales were thereafter delivered to the libelants in a damaged,

and nearly worthless, condition. The answer admits that while the steamer was lying in the port at Havana there were delivered to the said steamer, for transportation to New York, 399 bales of tobacco, and that thereafter the agents of the steamer issued, on behalf of the steamer, a bill of lading therefor, to which reference is made for the contents thereof. The answer then alleges, affirmatively, that before the tobacco was delivered to said steamer, and while the same was in transit from the shore to the steamer, 86 bales were damaged by a peril of the sea, or otherwise, and that thereafter the bill of lading referred to was delivered, in which, by an oversight or mistake, the injury to said 86 bales was not specified, and that this fact was known to the libelants when they received the bill of lading.

The proofs show that on the morning of March 10, 1882, the libelants, through their agent at Havana, applied at the office of Todd, Hidalgo & Co., the agents for the owners of the line of steam-ships of which the City of Alexandria was one, for transportation of 399 bales of tobacco to New York. The steamers of the line never come up to the wharves of Havana, but lie at anchor about half a mile from the Caballeria wharf, and all merchandise is taken to them by lighters. Persons desiring to make shipment by the line apply at the office of the agents, and the agents, if the application is assented to, issue to the shipper a shipping order, consisting of two parts,—one part containing an order addressed to the purser of the steamer to receive the goods, the other containing a form of receipt to be signed by him upon receiving the goods. Mr. Todd, of Todd, Hidalgo & Co., was a partner at the time, and had been for many years, of the firm of Mendez & Co., which firm was the owner of a large number of lighters. For several years it had been the course of business between shippers at Havana (including the libelants) and the agents for the steam-ship line for the shippers to deliver the shipping orders received from Todd, Hidalgo & Co. to Mendez & Co., or their employes, and Mendez & Co. would sign the receipt part of the order, and deliver it to the shipper, who thereupon, after delivering it to Todd, Hidalgo & Co., would receive from them a bill of lading in behalf of the steamer. Exceptionally, shippers would send their merchandise on board the steamers by lighters other than those of Mendez & Co., but Mendez & Co. seemed to have been understood by the mercantile community at Havana to be the recognized lighterers of the steam-ship company, and the libelants had uniformly caused their goods to be delivered to them. The lighterers at Havana have a uniform tariff of rates, and it was customary for the steam-ship company, when merchandise was delivered to their steamers by Mendez & Co., if lighterage had not been paid by the shipper, to pay the lighterage, and add it as a distinct item to the charges to be collected with the freight of the consignee.

On the occasion in question the agent for the libelants, after receiving the shipping order, caused it to be delivered to Mendez &

Co., and Mendez & Co. signed the receipt, and it was delivered to the libelants' agent. This receipt acknowledged the reception on board the City of Alexandria of the 399 bales of tobacco in good order and condition. While the tobacco was being transported by the lighter from the wharf to the steamer the 86 bales were damaged in the manner which has been stated. The same afternoon the agent of the libelants was notified of the accident. The next morning he called on Todd, Hidalgo & Co. They claimed the loss occurred by a peril of the sea, and that the libelants could recover the loss of the insurers of the cargo. They proposed to give the libelants a clean bill of lading for the 399 bales, and to assist them in obtaining payment from the underwriters. The libelants' agent insisted that the libelant should be compensated for the loss, but consented to make a claim against the Switzerland Marine Insurance Company, the underwriters. Under these circumstances Todd, Hidalgo & Co. executed the bill of lading referred to in the libel and answer, acknowledging the receipt of 399 bales upon the steam-ship in good order, and undertaking to deliver the same to the libelants at New York. The libelants did not pay the lighterage. Nothing was said about it by any of the parties, and the amount was added to the freight by the agents for the steamer on the bill of lading, in the customary way. Upon the arrival of the steamer in New York the libelants, with the participation of the owners of the steam-ship, made a claim against the insurers. There was no representation, however, that the loss occurred after the tobacco had been actually put on board the steamer, but the fact that the tobacco was injured by falling overboard while on the lighter was stated to the insurers. The insurers repudiated liability for the loss. Thereupon this suit was brought.

If the delivery of the tobacco to the lighter was equivalent to a delivery to the owners of the steamer, the steamer is liable *in rem*, notwithstanding the loss occurred before the tobacco was actually laden on board. This proposition is not open to discussion, upon the authority of *Bulkley* v. *Naumkeag Steam Cotton Co.*, 24 How. 386. The only distinction in the facts between that case and this is that there the lighter was employed by the master of the vessel to transport the goods to the vessel from the wharf. The loss took place by an explosion on the lighter, which threw the goods into the water, and subsequently the master of the vessel, with knowledge of the facts, signed a clean bill of lading for the whole quantity of goods. The supreme court held that the vessel was bound from the time of the delivery of the goods by the shipper and acceptance by the master; that the delivery to the lightermen was a delivery to the master; that the transportation by the lighter to the ship was the commencement of the voyage in execution of the contract the same in law as if the goods had been placed on board the ship instead of the lighter; and that the lighter was simply a substitute for the ship for this portion of the service.

Inasmuch as the master is but the agent for the owner of the vessel, this case cannot be distinguished from the case cited, if the owners themselves authorized the libelants to deliver their goods to the lighters of Mendez & Co., and have treated such a delivery as a delivery to their steamer. It is to be observed, not only that for many years the owners, through their agents, Todd, Hidalgo & Co., have allowed Mendez & Co. to receive goods from shippers, to be taken by lighters to the steam-ships, and sign receipts representing the goods as actually received by the steam-ships, but they have also allowed their agents to give bills of lading as though the goods were actually on board a specified steam-ship, although they were only in the custody of Mendez & Co., as lightermen. To such an extent has this practice been permitted to prevail as to give rise to a general understanding on the part of shippers dealing with them at Havana that Mendez & Co. were the authorized lightermen for the steam-ship line, and that goods delivered to them were in the custody of the steamship by which they were to be transported. Under such circumstances it would seem to be immaterial whether the lightermen were acting for the owners under any distinct arrangement with them, or whether the owners had any pecuniary interest in the business of the lighter. It suffices that the owners held out Mendez & Co. to the public as intrusted with authority by them to accept the delivery of goods, and receipt for the goods in behalf of the steam-ships, and as to those who, like the libelants, acted upon the faith of such apparent authority, the owners are estopped from disputing the existence of the authority exercised. It would not seem doubtful that after a shipper had delivered goods to Mendez & Co., pursuant to a contract with Todd, Hidalgo & Co., for their transportation by a particular steamer; had received a receipt from Mendez & Co. in behalf of the steamer; had presented that receipt to Todd, Hidalgo & Co., and received a bill of lading in behalf of the steamer,—there would be a lien upon the goods for freight in favor of the steamer, although the goods had not actually been put on board. They could not be heard to say that they had not parted with the custody of their goods, and delivered them in part performance of the contract for transportation to the steam-ship. If so, reciprocally, there would be a lien against the vessel in behalf of the shipper for the privileges of the contract.

The special circumstances of the present case fortify the position of the libelants, and place their rights upon a sound foundation. After all the facts were known, the agents for the owners recognized the delivery of the tobacco to the lightermen as a delivery to the steam-ship, by signing the bill of lading. The answer does not challenge the authority of Todd, Hidalgo & Co. to sign a clean bill of lading, but the owners, having full knowledge of the facts when their answer was interposed, assert, in substance, that the contract is not obligatory, because it was made by their agents through over-

sight or mistake, before the tobacco was delivered to the steamer. Their position upon the record is a ratification of the conduct of their agents, because they do not attempt to repudiate their acts, but seek to excuse them by a falsehood.

The libelants are entitled to a decree, with costs of this court, and of the district court. Their loss seems to have been estimated in the sum of $4,669, upon an appraisal made by the underwriters. If a decree for this sum, with interest, is not satisfactory to either party, there will be a reference to a commissioner to assess damages.