HIGGINS et al. v. ANGLO–ALGERIAN S. S. CO., Limited.

(Circuit Court of Appeals, Second Circuit. February 13, 1918.)

No. 139.

1. SHIPPING ☞106—BILLS OF LADING—CONTRACTUAL RELATION.

Libelants, who became the owners and holders in course of trade of bills of lading representing a shipment transported by sea, are in contractual relations with the carrier, and entitled to enforce the contract contained in the bills of lading.

2. SHIPPING ☞106—BILLS OF LADING—ESTOPPEL.

Where respondent, a carrier by water, though knowing that shipments of dates appeared to have been damaged when received, executed bills of lading reciting that the shipments had been received in good condition, the shippers having agreed to indemnify it against loss by reason of the false recitals, respondent is, as against holders of the bills of lading who acquired them in course of trade, estopped to deny that it received the shipments in good order.

3. SHIPPING ☞106—ACTIONS—FRAUD.

Where, on a libel based on bills of lading reciting receipt of shipments of dates in good condition, the carrier set up that the shipments had not been so received, and that it inserted such recitals in the bills of lading on agreement by the shippers to protect it, recovery by the libelant cannot be denied, on the theory that the libel was based on contract, and that it could not take advantage of the fraud, for the fraud was set up by respondent solely as a matter of defense.

4. ADMIRALTY ☞1—COURTS OF ADMIRALTY—NATURE OF RELIEF.

Though courts of admiralty are not courts of equity, and may not be able to give affirmative relief in case of contracts induced by preliminary fraudulent representations, still they proceed on equitable principles, and may prevent a party from taking advantage of his own fraud in the contract itself.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by William A. Higgins and another against the Anglo-Algerian Steamship Company, Limited. From a decree dismissing the libel (242 Fed. 568), libelants appeal. Reversed.

Foley & Martin, of New York City, for appellants.

Kirlin, Woolsey & Hickox, of New York City (John M. Woolsey, and Harry D. Thirkield, both of New York City, of counsel), for appellee.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

WARD, Circuit Judge. The libel alleged that Williams Hills, Jr., & Co. shipped November 8, 1911, on the steamer Armistan, then lying at Busreh, bound to New York, 3,000 cases of dates, receiving therefor a clean bill of lading reciting that they were apparently in good order and condition, of which William A. Higgins & Co., the libelants, became owners and holders in due course of trade, and that on arrival at New York 2,085 of the cases were found to be damaged by contact with water.

The answer denied that the cases were shipped in good order and condition, relied on exceptions in the bill of lading (a) that the quality,

contents, and value of the cases were unknown; (b) rain, spring, sweat, or land damage; (c) that the mate's receipts were to be conclusive evidence of the condition in which the goods were received by the company; (d) that no claims against the company should be enforceable, unless notice be given in writing before removal of the goods, and claim be received in London within 60 days after discharge. Further, the respondent had the courage to set up as a defense its own complicity in a fraud, viz., that a large number of the cases which had been wet and were stained and discolored by rain were received from lighters; that their stained, damaged, and discolored condition had been noted on the mate's receipts, but that a clean bill of lading was delivered to the shippers at their request, against their agreement to indemnify the respondent against loss for so doing. This was pleaded as an admission binding on the holder of the bill of lading that the cases were not shipped in apparent good order and condition, and a bar to the maintenance of the libel.

The mate's receipts were taken up at Busreh upon delivery of the bill of lading, of which the libelants became owners for value without notice of the circumstances under which it was delivered. 1,665 of the cases were by order of the libelants delivered January 8, 1912, to a warehouse, and, their condition being discovered, the libelants on the next day served notice of the damage, and the balance were removed from the ship thereafter and survey held.

The District Judge found that the cases were injured by rain water or sea water while on lighters before delivery to the ship; but he further held, while recognizing the fraud, that the untruthful statement of receipt in apparent good order and condition only estopped the carrier from asserting that the cases were in good order and condition, but not from showing that they were damaged by rain water, liability for which was excepted in the bill of lading.

[1] The libelants, as holders of the bill of lading, are in contractual relation with the carrier and entitled to enforce the contract. The carrier agreed to deliver the shipment in like good order and condition as when received, to the order of the shipper. That it has broken the contract to deliver in apparent good order and condition is quite clear. If the statement in the bill of lading were true, the carrier could show that the goods really were not in good order and condition, and could protect itself by any applicable exception in the bill of lading.

[2] The effect of acknowledging in a bill of lading the receipt of goods as in apparent good order and condition when they are not so has been considered in several cases. Channell, J., in Campania Navi- era v. Churchill, [1906] 1 K. B. 237, in considering the effect of such a statement as against the indorsee of the bill of lading, expressed surprise that the question had not been decided. He did not regard the statement as part of the contract, but as an affirmation which the carrier must be taken to have known would be acted on by purchasers of the bill of lading, and which it was therefore estopped from denying. Accordingly he held the carrier liable to the indorsee for the difference between the value of the goods as delivered and the value they would have had if actually in good order and condition. This deci-

sion was followed by Scrutton, J., in Martineau, Ltd., v. Royal Mail Co., [1912] 17 Com. Cas. 176, and Judge Nelson came to a similar conclusion in Bradstreet v. Heran, 2 Blatchf. 116, Fed. Cas. No. 1,792a. He said:

"The consignees made large advances upon the cotton, on the faith of the representation in the bill of lading that it was shipped in good order. They were justified in doing so, and their security should not be lessened or impaired by permitting the master to contradict his own representation in that instrument. It might be otherwise if the question arose between the master and the owner of the cotton. The question of damage might, in that case, be well limited to that occurring in the course of the voyage, notwithstanding the bill of lading. But the respondents stand in the light of bona fide purchasers, who become such on the faith of the representations of the master."

Crawford v. Allan Line, [1912] App. Cas. 130, arose in 1904 out of a shipment of 41,000 bags of flour from Minneapolis to Glasgow on a through bill of lading. This was treated throughout as a novel instrument, needing construction because of the difficulty holders of the bill of lading in England had in recovering damage claims. The through bill of lading was signed on behalf of the successive inland carriers, as well as of the ocean carrier, by an agent for all the carriers at Minneapolis. It recited that the goods were received in apparent good order and condition. Its conditions were divided into two classes; the first applying to the inland carriers, and the second to the ocean carrier. It was an express condition that each carrier should be responsible only for damage occurring on its own line. To enable the owner to know to whom to look for compensation, each carrier was obliged to notify the preceding carrier of the condition of the goods when received by it. The ocean carrier at New York receipted to the last inland carrier for the bags as in apparent good order, except in the case as noted of 110 bags. On delivery at Glasgow it was found that 4,132 bags were caked by fresh water. The proof showed that the shipment had been hurriedly loaded, without adequate examination, and in rainy weather. The Lord Ordinary decided in favor of the consignees, but his judgment was reversed by the Court of Session, and thereupon an appeal was taken to the House of Lords, which was decided in December, 1911. The material difference between the Scotch courts was that the Lord Ordinary held the recital as to the apparent condition of the goods at Minneapolis applied to all the carriers, except as each notified the preceding carrier of some defect. On the other hand, the Court of Session held that the recital applied only to the first carrier from Minneapolis. The House of Lords unanimously reversed the decision, holding the ocean carrier liable because of its failure to notify the last carrier of any apparent defect in the shipment, except in the case of 110 bags.

It is to be noted that in all the foregoing cases the statement, though untrue, was the result of negligence, or misunderstanding, or mistake; whereas, there can be no other explanation of the carrier's conduct in this case than that it was willing to assist the shipper in misleading subsequent holders of the bill of lading, provided he agreed to hold it harmless for so doing. Although a bill of lading is only a quasi negotiable instrument, we are not impressed by the argument that, be-

cause the carrier could have set up this defense against a shipper, it can set it up against the subsequent holder of the bill of lading, who was intended to be misled, because he is the assignee of the shipper.

[3] The respondent insists that, as the libel is founded on contract on the bill of lading, nothing being said about fraud, it would be allowing the libelants to recover on a new and different cause of action if the case were disposed of on that ground. The answer is the respondent itself introduced all the evidence showing the fraud.

[4] The case of The Persiana, 185 Fed. 396, 107 C. C. A. 416, is relied on as authority for holding that there can be no recovery, at least in connection with the 1,665 cases which were removed from the carrier's possession before notice of claim was given. Though courts of admiralty are not courts of equity, and may not be able to give affirmative relief in the case of contracts induced by preliminary fraudulent representations (Williams v. Insurance Co. [D. C.] 56 Fed. 159), still they do proceed upon equitable principles and may prevent a party from taking advantage of his own fraud in the contract itself. Pew v. Laughlin (D. C.) 3 Fed. 39, The Hero (D. C.) 6 Fed. 526, and The Electron (D. C.) 48 Fed. 689, are examples. To give the carrier the benefit of this exception would be to enable it to protect itself against the consequences of its own fraud.

The decree is reversed.