AUSTIN NICHOLS & COMPANY v. STEAMSHIP "ISLA DE PANAY," HER ENGINES, ETC., ET AL.

SANCHEZ ET AL., COPARTNERS, TRADING AS E. SANCHEZ & COMPANY, v. STEAMSHIP "ISLA DE PANAY," HER ENGINES, ETC., ET AL.

E. TOLIBIA & COMPANY v. STEAMSHIP "ISLA DE PANAY," HER ENGINES, ETC., ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

Nos. 199, 200, 201. Argued January 19, 1925.—Decided March 2, 1925.

In proceedings *in rem* brought by consignees against a vessel to recover for damage to shipments of olives consigned in casks from Seville to New York, it appeared: that the damage was due to the weakness of the casks in which they were shipped and not to the ship's negligence; that this weakness was known to the ship's agent, before he accepted the shipment from the consignors at Seville and issued bills of lading, and to her captain when the casks were transferred from another vessel to the libeled ship at Cadiz; that the agent had accepted the shipment and issued the bills of lading "clean," without noting thereon the state of the casks, upon condition that the consignors give the shipowner a letter of guarantee relieving it from responsibility therefor, which was done; that the bills of lading expressly exempted the ship from responsibility for damage resulting from fragile containers; that the consignees had directed their Seville bankers to pay the agreed purchase price for the olives upon presentation of clean bills of lading, and that the consignors thus obtained payment upon the bills in question, though there was nothing to show that the ship or its owner knew of this arragement between buyer and seller or that the bank, in accepting the bills, lacked information of the circumstances attending their issue. The petition did not allege fraud or any peculiar trade usage at Seville—*Held:*

(*a*) That the evidence was insufficient to establish fraud. P. 272.

(*b*) That the evidence, including testimony by the ship's captain, was insufficient to establish a trade usage that bills of lading without notations impliedly acknowledged receipt of merchandise in apparent good order and condition. P. 272.

(*c*) According to the long established rule, bills of lading, like those in question, do not affirmatively represent good order and condition; and the Harter Act, (c. 105, 27 Stat. 445,) does not require that they be given a different effect, either by construction or by estoppel. P. 273.

292 Fed. 723, affirmed.

CERTIORARI to decrees of the Circuit Court of Appeals affirming decrees of the District Court, which dismissed three libels *in rem* for damages to goods.

*Mr. T. Catesby Jones,* with whom *Mr. James W. Ryan* was on the briefs, for petitioners.

The decision of the lower courts that although the petitioners were defrauded there can be no estoppel unless there is an express representation by a recital in the bill of lading, is directly contrary to the decisions of this Court and of the Circuit Courts of Appeals of other circuits that an estoppel need consist only of a concealment of a material fact by a person under a duty to disclose it resulting in prejudice to the person from whom the information has been withheld. *Morgan* v. *Railroad Company,* 96 U. S. 716; *Leather Manufacturers' Bank* v. *Morgan,* 117 U. S. 96; *Dickerson* v. *Colgrove,* 100 U. S. 578; *United States Bank* v. *Lee,* 13 Pet. 107; *Stewart* v. *Wyoming Ranch Co.,* 128 U. S. 383; *Turner* v. *Green* (1895) 2 Ch. 205.

In the present case there was not merely negligence or silence of the *Isla de Panay's* agent, but deliberate and intentional concealment. Her agent did not merely stand by when the bills of lading were issued, but conspired with the shippers to defraud purchasers of the goods shipped. He declined to issue clean bills of lading until the shippers would indemnify him against what he knew would be a result of his fraudulent act.

The decisions of the courts below are contrary to the decisions of Circuit Courts of Appeals of other circuits. *H. Scherer & Co.* v. *Everest*, 168 Fed. 822; *The Tampico*, 270 Fed. 537.

The elements of an estoppel *in pais* are stated by Pitney J., in *Central Railroad Co.* v. *MacCartney*, 68 N. J. L. 165. See *Higgins* v. *Anglo-Algerian S. S. Co.*, 248 Fed. 386; *Martineaus* v. *Royal Mail Steam Packet Co.*, 12 Asp. M. C. 190; *Bradstreet* v. *Heran*, 3 Fed. Cas. 1183; *Crawford & Law* v. *Allan Line S. S. Co.*, (1912), A. C. 130; *National Bank* v. *Kershaw Oil Mill*, 202 Fed. 90; *Nelson* v. *Woodruff*, 1 Black 156.

If the *Isla de Panay's* agent were entirely innocent of misrepresentation or fraud, the *Isla de Panay* should, nevertheless, be held liable under the rule that, where one of two innocent parties must suffer, he must bear the loss whose act put it in the power of the third party to commit the wrong. *Peoples Bank* v. *National Bank*, 101 U. S. 181; *Butler* v. *United States*, 21 Wall. 272; *Pompton* v. *Cooper Union*, 101 U. S. 196; *Hern* v. *Nichols*, 1 Salkeld 289; *Briggs* v. *Jones*, 10 Eq. 92; *Smith* v. *Armour Packing Co.*, 158 Fed. 86; *H. Scherer & Co.* v. *Everest*, 168 Fed. 822.

The carrier was under a duty to disclose to the consignee the fact that the casks were apparently in bad external condition and unfit for carriage. *Rodocanachi* v. *Milburn* (1886), 18 Q. B. D. 67; *Hinrichs* v. *Bank*, 279 Fed. 382.

The *Isla de Panay*, being a general cargo ship, had the same right as any other common carrier to refuse to accept goods packed in defective containers. *Hannibal R. R. Co.* v. *Swift*, 12 Wall. 262; *The David & Caroline*, 5 Blatch. 266.

An implication arises that the goods covered by the bill of lading are normally fit to withstand ordinary handling during the carriage and discharge, unless the shipmaster makes notations to the contrary. This implication also arises as a corollary of the principle recognized as to all

kinds of contracts, that it is the duty of a contracting party who has exclusive knowledge of material facts to disclose those facts to the other party. *Strong* v. *Repide,* 213 U. S. 419; *Molyneux* v. *Hawtrey,* L. R. (1903) 2 K. B. 487; *Carlish* v. *Salt,* L. R. (1906) 1 Ch. 335; *Phillips* v. *Homfray,* L. R. 6 Ch. 770; Williston on Sales (2nd Ed.) §§ 234 and 265; *Cesar* v. *Karutz,* 60 N. Y. 229; *Harp* v. *Choctaw O. & G. R. Co.,* 125 Fed. 445.

The liability of a common carrier of goods does not primarily, at least, rest on the contract to carry, but is implied by law, having its foundation in the policy of the law, and it is by reason of this legal obligation that a carrier is charged with the loss of, or injury to, property intrusted to it for carriage. *Railroad Co.* v. *Swift,* 12 Wall. 262; *The Georg Dumois,* 88 Fed. 537; *Klauber* v. *American Express Co.,* 21 Wis. 21; *Atlantic Coast Line R. Co.* v. *Rice,* 169 Ala. 265; *The Delaware,* 14 Wall. 579.

A duty to disclose also arose from the trade usage which was testified to by the respondent's witnesses. This usage required that if casks were offered for shipment in apparent bad external condition, the bills of lading should contain notations showing that fact.

A duty to disclose also arose from the issuance by the *Isla de Panay* of commercial documents intended for sale to innocent buyers. Admiralty courts have always held the issuers of bills of lading to a high standard of fairness. This tends to encourage commerce. If there is no duty of the issuer of a bill of lading intended for sale to an innocent consignee to disclose, at least in a general way, facts obviously impairing the value of the bill of lading, ships' agents will be encouraged to issue confused and ambiguous bills of lading and to tamper with the centuries-old recitals which have made bills of lading a trustworthy and marketable symbol of the goods described and thus permitted the expansion and development of international commerce. *Pollard* v. *Reardon,* 65 Fed. 848; *Watts* v. *Cargo of Lumber,* 161 Fed. 104.

A duty to disclose also arose from § 4 of the Harter Act of February 13th, 1893. *Knott* v. *Botany Mills*, 179 U. S. 69; *The Delaware,* 161 U. S. 459; *Hansen* v. *American Trading Co.*, 208 Fed. 884.

The court below incorrectly decided as matter of law that "the burden of proof rested upon the libelants to establish negligence on the part of the claimant, and this burden we have no hesitation in saying was not sustained." *Higgins* v. *Anglo-Algerian S. S. Co.*, 248 Fed. 386; s. c. 242 Fed. 568; *Bank of Batavia* v. *New York etc., R. Co.*, 106 N. Y. 200.

*Mr. John W. Crandall* for respondent.

The Circuit Court of Appeals correctly held that the petitioners were not entitled to a recovery against the steamship *Isla de Panay,* because the damage to the merchandise came within the exemptions of the bills of lading issued for the goods and the petitioners totally failed to prove negligence on the part of the ship or the claimant-respondent.

The cargo owners assume the burden of proving negligence when the damage falls within a valid bill of lading exemption. *Clark* v. *Barnwell,* 12 How. 272; *The Henry B. Hyde,* 90 Fed. 114; *The Patria,* 132 Fed. 971; *The Lennox,* 90 Fed. 308; *The J. L. Luckenbach,* 209 Fed. 142; *The Arpillao,* 270 Fed. 426.

The petitioners' casks were of insufficient strength for the carriage of olives. The *Isla de Panay* is therefore exempt from liability both under the Harter Act and the exceptions of the bills of lading.

The case of *Higgins* v. *Anglo-Algerian S. S. Co.*, 248 Fed. 386, which has been practically the sole reliance of the petitioners, is unsound. *Williams* v. *Providence Washington Ins. Co.*, 56 Fed. 159; *The Plymouth,* 3 Wall. 20; *Pollard* v. *Vinton,* 105 U. S. 7; *Atchison, Etc., Ry. Co.* v. *Harold,* 241 U. S. 371; *St. Louis, Etc., Ry. Co.* v. *Knight,* 122 U. S. 79.

Neither the *Isla de Panay* nor her owner is estopped from showing the insufficiency of the petitioners' casks. *The Eli Whitney* (1848), Fed. Cas. 4345.

A carrier issuing a bill of lading which is silent as to the condition of the goods, is not thereby penalized by being deprived of the defenses ordinarily available under the Harter Act. *The Isola di Procida*, 124 Fed. 942.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

These are proceedings *in rem* against the Isla de Panay to recover for damage to merchandise brought by her from Cadiz, Spain. They present the same issues and were heard on the same proof. It will suffice to refer to the facts disclosed in number 199.

December 21, 1917, in the United States District Court, Southern District of New York, Austin Nichols & Company, a corporation, filed a libel and complaint against the respondent steamship.

It alleged: Ownership of the damaged merchandise. Presence of the vessel within the court's jurisdiction. That " On October 27, 1917, Rowlett y Pyman shipped and placed on board the steamship Isla de Panay, then lying at the port of Cadiz, Spain, two hundred and twenty-seven (227) packages of olives in good order and condition, to be carried by the said steamship Isla de Panay as a common carrier from the port of Cadiz to the port of New York and there to be delivered in like good order and condition as when shipped to your libellant, in accordance with the terms of bills of lading then and there issued for the said shipment and in consideration of an agreed freight. Thereafter the said steamship Isla de Panay sailed from the port of Cadiz and arrived at the port of New York in the month of November, 1917, and there discharged her cargo, not in like good order and condition as when shipped, but badly damaged."

Consequent damages amounting to about eleven thousand dollars.

It prayed: For process according to the course and practice in causes of admiralty and maritime jurisdiction to issue against the steamship, her engines, boilers, etc. That a decree be granted for the damage sustained and the steamer condemned and sold to satisfy the same.

The Compañia Trasatlantica claimed the vessel as sole owner, obtained her release and answered, denying liability. It admitted receipt of the goods and alleged their carriage and delivery as required by the bills of lading. It specifically admitted and alleged: " That on or about the 6th day of November, 1917, there were shipped on board the steamship Isla de Panay, then at the port of Cadiz, Spain, and bound for the port of New York, 227 casks said to contain olives, the weight and contents of said casks and their quality, however, being stated to be unknown to the claimant, which expressly declined to be responsible therefor. . . . That it was agreed that the merchandise should be transported for a stipulated freight to the port of New York and there be delivered to the order of the libellant, subject to the conditions and exceptions from liability contained in the bills of lading issued for said merchandise at Seville, Spain, from which port said merchandise was shipped in the first instance. . . . That thereafter the steamship Isla de Panay sailed from the port of Cadiz, Spain, and arrived in due course at the port of New York in the month of November, 1917, and that it thereafter delivered at the port of New York all of the above mentioned merchandise which it received on board the ship at Cadiz in pursuance of and in compliance with the terms and conditions of the bills of lading hereinabove referred to.". That the bills of lading expressly exempted the vessel from responsibility for damage resulting from breakage of the articles and fragile containers; the ship was in all respects seaworthy,

properly manned, equipped and supplied for the voyage; if the merchandise suffered loss or damage the ship was relieved from liability by the bills of lading, particularly that clause concerning breakage and fragile containers, also by the Harter Act, approved February 13, 1893, c. 105, 27 Stat. 445, 446.

Upon the indicated issues evidence was taken and the cause went to hearing.

The agent of the owner of the Isla de Panay stationed at Seville, Spain, there accepted the casks of olives (each of them weighed 1500 pounds or more) and delivered to the consignors bills of lading. · These recited: " M. Rowlett and Pyman has shipped on board the Spanish steamer Isla de Panay, its captain M—, with destination to New York and consigned to Austin Nichols, the effects declared on back on the following conditions. . . . ignoring weight and contents." They said nothing concerning order or condition of the merchandise and contained exemption clauses as stated in the answer.

The casks were carried down the River Guadalquivir seventy-five miles to Cadiz, on a small steamer belonging to the owner of the Isla de Panay, and were there delivered to her. They were loaded, stored, transported and landed at New York without negligence or default by the vessel; but the casks broke and the olives were damaged. That the casks were old, weak and quite liable to break was observed by the owner's agent at Seville, and because of this he declined to accept them until the shippers gave the following agreement to secure against loss—

" Sevilla, November 5, 1917.
Compañia Trasatlantica, Sevilla.

My dear Sirs: With reference to the shipment of 227 casks of olives that we are making by the steamer Isla de Panay to New York, we understand that that company considers the containers insufficient and that it does not

accept responsibility for the damages that they suffer as natural consequences of the voyage. And as guarantee of that company we sign the present, as you have delivered us clean bills of lading. Yours very truly, Rowlett & Pyman."

The captain of the Isla de Panay did not see the bills, nor did he know of the letter of guaranty until after the voyage had been completed. He observed the bad condition of the casks before accepting them at Cadiz, and their imperfection was noted on the accompanying shipping orders.

It appears that Austin Nichols & Company had directed their bankers at Seville to pay the agreed purchase price for the olives upon presentation of clean bills of lading. The bankers accepted the bills presently under consideration and paid the stipulated price to the consignors. There is nothing to show that the ship or her owner knew of the particular arrangement between buyer and seller.

Libellants now insist that a trade usage prevailed at Seville under which bills without notation were regarded as receipts for merchandise in apparent good order and condition, and to establish this usage they rely upon an answer in the testimony of the vessel's captain. When asked by respondents' counsel, " Why are these letters of guarantee given in Seville? " he replied—

" If the bills of lading are issued with a note on them the insurance companies or the bankers in Spain will not accept that bill of lading on account of the condition in which the goods are, but if they have no clause on it they will pass it to a banking house and the insurance company that they have been shipped by the shipper in apparent good order and condition, although they have issued a letter of guarantee relieving the company of any responsibility whatsoever for the condition of the packages."

Eduardo Benjumea, the owner's agent at Seville who issued the bills, testified—

" In view of the above and as was usually done in such cases, according to custom and at the request of the shippers in order that their goods might not be prejudiced more than was necessary, and at the same time to relieve the company which I represent from responsibility, I ordered the acceptance of the letters of guarantee . . . The custom of demanding letters of guarantee by steamship companies from shippers to protect themselves from possible claims for the arrival in bad condition of the shippers' goods at the port of destination, is old and well established and based on the following: (1) The decided opposition on the part of the shippers to notations being placed on the bills of lading which unnecessarily prejudices their goods and leaves everything to the good faith of the receivers. (2) Due to the general character that would necessarily have had to be given to the notations on the bills of lading and it being practically impossible to examine carefully all the casks one by one both on account of economy and fixed dates on which the mail boats of the Compania Trasatlantica had to depart from Cadiz for the States; we could make, with such notations, greater damage than would be justifiable, which considering the honorable practices of the Compania Trasatlantica, we naturally tried to avoid. (3) Although letters of guarantee were always requested for the above stated reasons, an exceptional use of these letters was made during the European war, as a consequence of the general bad quality of the packing which, during that time, was presented for shipment. This bad quality of the packing was due to the lack of containers in good condition and an enormous demand for containers of this class which it was impossible to meet. What took place was the use of all available containers notwithstanding their sometimes inferior quality; that is, chestnut wood was accepted in place of oak in spite of the fact that old oak containers are stronger than new ones of chestnut. I

have been sixteen years in the shipping business as shipping agent, and have had a great experience in matters thereto pertaining, derived from the years so spent."

The District Court dismissed the libel. It said—

" The great weight of evidence is to the effect that the chestnut casks containing the olives were old and insufficient at the time the merchandise left Seville for transshipment to claimant's vessel at Cadiz . . . The libelants paid drafts accompanying the bills of lading without knowledge that the containers were old and insufficient. If there is any liability here for damages it is upon the theory that by failing to note in the bills of lading any insufficiency in the containers, the steamship misled the libelants to their injury and is now estopped under the doctrine of *Higgins* v. *Anglo-Algerian Steamship Co.,* 248 Fed. 386, to claim that the containers were insufficient. In that case, however, there was in the bill of lading an express representation that the merchandise itself was in apparent good order and condition, when it was known to be injured by rain water. Here the parties believed doubtless that the olives would go through, but the ship's agents were not willing to take the risk of any liability which might arise from old casks. No case has gone so far as to hold that a bill of lading containing no words representing the condition of the containers would give rise to an estoppel. The Harter Act expressly provides that the vessel shall not be liable for any ' insufficiency of package.' "

The Circuit Court of Appeals affirmed the decree of dismissal. Having pointed out that the proceedings were *in rem* against the vessel and not *in personam* against the owner; that the libel alleged the merchandise was placed on board " in good order and condition," and was not discharged " in like good order and condition "; that the bills were not signed by the captain; that the containers were weak when received, etc.; that court expressed inability

to discover any ground upon which the libel could be sustained. It found—

"In the instant cases the damage to the merchandise came within the exceptions of the bill of lading which declared that the shipowners were not responsible for breakage. That many of the casks were broken is undisputed. The burden of proof rested upon the libelants to establish negligence on the part of the claimant and this burden we have no hesitation in saying was not sustained. On the contrary it has been established by the overwhelming weight of evidence that whatever damage the merchandise suffered in the cases now before the court was due not to the negligence of the ship but to the old and insufficient containers in which the goods were shipped."

And it held that the ship was not estopped to set up the bad condition of the casks by anything done at Seville or under the Harter Act; and that *Higgins* v. *Anglo-Algerian S. S. Co.,* 248 Fed. 386, was not controlling.

Counsel for petitioners maintain: That with corrupt purpose and as part of a scheme to defraud petitioners, the ship issued bills of lading designed to conceal the bad condition of the casks, knowing that the shippers intended to obtain money upon them according to the local usage. That under the Seville usage bills of lading without notations impliedly acknowledged receipt of the merchandise in apparent good order and condition, and the ship could not repudiate this representation. That, considering this local trade usage, it was the positive duty of the ship to disclose the bad condition of the casks. Failure therein made the fraud upon petitioners possible, and "Where one of two innocent parties must suffer he must bear the loss whose act put it into the power of the third party to commit the wrong." That Section 4 of the Harter Act imposed the positive duty to disclose the containers' bad condition. And, finally, that the doctrine approved in *Higgins* v. *Anglo-Algerian S. S. Co.,* is applicable and controlling.

Evidently the libels were drafted with the expectation of showing that the merchandise suffered. damage from bad handling. Petitioners' witnesses testified that the casks reached New York in good condition but were negligently unloaded. The manager for Austin Nichols & Company said: " The casks were satisfactory containers." " I do not claim that the casks were bad." " Our claim is, that these casks were handled in a bad way, by bad methods." " I do not make any claim about the casks, but we are making a claim about the manner in which they were handled."

The courts below, correctly we think, have found that the overwhelming weight of evidence shows the casks were in bad condition when received at Cadiz but were loaded, carried and discharged without negligence or fault.

Petitioners did not allege fraud or any peculiar trade usage at Seville, and there is no sufficient evidence to establish either of these things. The mere statement by the ship's captain referred to above is not enough to show a peculiar trade usage at Seville, there commonly known and acted upon;.and it does not apear that the bank which accepted the bills of lading lacked full information concerning the circumstances attending their issue. The argument of counsel proceeds mostly upon assumption not supported by the record. *Bowling* v. *Harrison,* 6 How. 248, 259; *Adams* v. *Otterback,* 15 How. 539, 545, 546; *Oelricks* v. *Ford,* 23 How. 49, 61, 62. And see Carver on Carriage of Goods by Sea, 6th Ed., Sec. 181 *et seq.*

The Harter Act provides—

" Sec. 4. It shall be the duty of the owner or owners, masters, or agent of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to issue to shippers of any lawful merchandise a bill of lading, or shipping document, stating, among other things, the marks necessary for identification, number of packages, or quantity, stating whether

it be carrier's or shipper's weight, and apparent order or condition of such merchandise or property delivered to and received by the owner, master, or agent of the vessel for transportation, and such document shall be *prima facie* evidence of the receipt of the merchandise therein described.

"Sec. 5. For a violation of any of the provisions of this act the agent, owner, or master of the vessel guilty of such violation, and who refuses to issue on demand the bill of lading herein provided for, shall be liable to a fine not exceeding two thousand dollars. . . ."

In the present case the bills of lading were issued as agreed by the parties—no demand was made for bills with different recitals. According to the long established rule, bills like those before us do not affirmatively represent good order and condition (*Atchison, Topeka & S. F. Ry. v. Harold,* 241 U. S. 371), and we find nothing in the Harter Act which requires that they be given a different effect, either through construction or by estoppel.

*Higgins* v. *Anglo-Algerian S. S. Co., supra,* is essentially different from the present cause. There the bill of lading expressly recited that the merchandise had been received in good order and condition; and the ship was seeking to escape liability by setting up its own wrongful action.

The decrees below must be

*Affirmed.*

MR. JUSTICE SUTHERLAND, dissenting.

I am unable to agree with the opinion just delivered. It seems to be conceded, but in any event I think it must be conceded, that if the bills of lading had contained a recital that the merchandise was received in good condition the ship would have been estopped from asserting that in fact it was in bad condition. *Higgins* v. *Anglo-Algerian S. S. Co.,* 248 Fed. 386. Here, I think, the circumstances are such as to make the omission of a recital

42684°—25——18

SUTHERLAND, J., TAFT, C. J., and VAN DEVANTER, J., dissenting.   267 U. S.

upon the subject the equivalent of a statement of good condition.

The shipment was accepted and the bills of lading issued by the ship's agent [1] who testified that he was aware of the bad condition of the merchandise and that the letters of guarantee were taken with the understanding that no notation to that effect would be made on the bills. They were what are known as " clean bills," which meant, in this case at least, according to the evidence, bills which " a banker will accept and attach to a draft and on which he will make payment against a letter of credit, and which *indicates that the merchandise was in good condition when it was received from [by] the steamship company."* Without going into detail, I think it is fairly to be deduced from the evidence that the usages of the trade required a notation, and the evidence is clear that a notation of bad condition would have been made except for the letters of guarantee. The master of the Panay testified: " If a letter of guarantee is given me relieving me or the ship of all responsibility, as was done

---

[1] Section 4 of the Harter Act makes it the duty of the owner, master or *agent* of the *vessel* to issue a bill of lading. The bills of lading recite that the merchandise in question has been shipped on " the Spanish steamer Isla de Panay " and purport to be issued by the "Agent of the Steamer." The agent at Seville who issued the bills, in one place calls himself an agent of the company and in another place speaks of " this agency for the S. S. Isla de Panay." The fact is that the question of agency was not seriously in issue in the trial court, and the statements in the evidence relating thereto were more or less casual, but enough appears to make it clear to my mind that the relation of agent to the ship was fairly established. A point is made of the fact that the bills of lading were delivered at Seville while the merchandise was delivered to the Panay at Cadiz. But delivery of the merchandise at Seville to the small steamer belonging to the same owner, for the sole purpose of transshipment, was in effect a delivery to the Panay. *Bulkley* v. *Naumkeag Steam Cotton Co.*, 24 How. 386; *The City of Alexandria*, 28 Fed. 202, 205–206.

SUTHERLAND, J., TAFT, C. J., and VAN DEVANTER, J., dissenting.

in this case, no notation will be put on the bill of lading, but if there is no letter of guarantee given, then a notation will be put on the bill of lading."

Consignees had instructed their bankers in Spain to pay the purchase price of the goods only upon presentation of clean bills of lading, and there is evidence to the effect that if bills are issued with a notation of bad condition they will not be accepted by insurance companies or bankers in Spain, but if such note be omitted they will pass, upon the assumption that the goods have been shipped in apparent good order and condition. Upon this assumption, the bills were passed and payment made. Under these circumstances, the omission of the notation in respect of the condition of the goods was nothing short of a suppression of the truth in order to further the fraudulent designs of the shippers. Upon every principle of fair dealing it should be regarded as the equivalent of a false notation of good condition which the ship is estopped to deny as against the claims of the consignees who relied upon it. To hold otherwise is to permit the wrongdoer to take advantage of his own misconduct, which a court of admiralty cannot allow with due regard for those equitable principles by which it is governed.

I am authorized to say that the CHIEF JUSTICE and MR. JUSTICE VAN DEVANTER concur in this dissent.