## NEW ENGLAND NEWSPAPER PUB. CO. v. UNITED STATES.

### No. 93.

District Court, D. Massachusetts.

March 11, 1937.

Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass., for New England Newspaper Pub. Co., libelant.

Francis J. W. Ford, U. S. Atty. of Boston, Mass. (Robert W. Meserve, Asst. U. S. Atty., of Boston, Mass., of counsel), for the United States.

Thomas H. Mahony and Walter F. Levis, both of Boston, Mass., for F. Jarka Co., Inc., impleaded respondent.

Putnam, Bell, Dutch & Santry, of Boston, Mass. (A. J. Santry and F. Fish, both of Boston, Mass., of counsel), for E. S. Booth, impleaded respondent.

Putnam, Bell, Dutch & Santry of Boston, Mass. (A. J. Santry and F. Fish, both of Boston, Mass., of counsel), for William S. Booth, executor, impleaded respondent.

BREWSTER, District Judge.

This libel is brought against the United States to recover for damages to a shipment of rolls of newsprint which were carried from Hamburg to Boston in December, 1926, and January, 1927, on the steamship West Campgaw and the steamship West Harcuvar. The stevedores who discharged the cargoes at Boston are the impleaded respondents.

Statement of Facts.

The shipments of newsprint originated in Hallstavik, Sweden, and were carried from that port to Hamburg by four Swedish steamers.

Five through bills of lading, covering 3,218 rolls of newsprint, were issued at Hallstavik by the Swedish steamers. The bills of lading issued by the initial carrier all contained the statement that the paper was shipped in "apparent good order and condition."

The West Campgaw and the West Harcuvar were United States vessels, operated by a Boston partnership under the trade-name of the "Yankee Line." The agent of this line at Hamburg was the Deutsche American Shipping Company. Neither the United States, the Yankee Line, the vessels, nor the Deutsche American Shipping Company issued any bills of lading for the cargo when it was delivered to the West Campgaw and the West Harcuvar from the Swedish steamers at Hamburg. None of these parties ever had the original bill of lading in its possession. A copy of each through bill of lading, in the usual course of business, passed through the office of the Deutsche American Shipping Company.

The rolls of newsprint were transshipped—1,555 rolls by the West Campgaw and 1,663 rolls by the West Harcuvar. Many of these rolls were in a damaged condition. This fact was noted on the copies of two bills of lading, as follows: "Wrappers more or less damaged. Some rolls wet. Condition of contents unknown." On the other three bills of lading the notation read: "Wrappers damaged. Condition of contents unknown."

Copies of the bills of lading and receipts with the above notations were delivered to the representative of the shipper at Hamburg. The manifests of both vessels had substantially similar notations and, in the case of the West Harcuvar, the damaged condition of the cargo was noted on the log of the vessel.

The cargo of paper was taken on by the West Campgaw while the vessel was lying off dolphins in the stream. The paper was brought to the vessel by two barges which came alongside the vessel.

The First Officer of the West Campgaw, who supervised the stowing, testified that he saw the barges as they came alongside and made some observations regarding the condition of the rolls as they appeared on the barge. Due to the way the cargo was stowed in the barge he could only see the ends of the rolls. He noticed that the rolls on top were in apparently good condition, but as the stevedores worked down into the barge the rolls seemed to be cut and the wrappers torn; in some instances the contents were cut. These observations were made respecting both of the barges.

The West Harcuvar took on board the cargo of newsprint while lying in the stream. Some of it was taken from barges, but the greater part was taken from two Swedish vessels which came alongside. The name of one steamer does not correspond with the name of any steamer issuing the bills of lading.

The First Officer on the West Harcuvar testified that he saw the cargo on the Swedish steamers as soon as the hatches were taken off, and that the condition was so bad that he refused to accept it until a representative of the Deutsche American Shipping Company told him to accept, and a notation of the condition would be made on the bills of lading and manifests. He found these rolls wet and badly torn and described the condition of the whole cargo as "deplorable."

Some of this cargo was loaded at night, when it was impossible to notice hook holes or other slight damage. This officer prepared a list of the rolls which he found to be more seriously damaged. This showed 91 rolls with wrappers torn; 46 rolls, contents damaged; 42 rolls, wet; 3 rolls badly torn, and 1 roll torn by hook. This list was reported to the agents at Hamburg. In the West Harcuvar's log an entry was made to the effect that several rolls of paper, received from barge alongside, had wet outside wrappers. On January 4, 1927, another entry showed that "all cargo received from the S/S Hudiksval outside wrappers torn and in very poor condition."

From the testimony of the inspector and two tallymen employed by the Deutsche American Shipping Company, who supervised and checked the loading of paper on both vessels, it appears that before the rolls were placed on board a large number were more or less damaged. The first tallyman reported this to the inspector shortly after loading began and received instructions to make a sufficient number of "writings-off" to protect the vessel later from claims. As a result, the notations on the bills of lading and manifests were made as shown above. The checking revealed that almost all rolls were more or less damaged. Only those with particular damage were recorded according to the number of the roll. "Only a general writing-off could be effected inasmuch as without opening the roll the extent of the damage could not be verified." "It was attempted but it was not possible to ascertain whether the damage originated from the use of hooks or from other causes." Some rolls were loaded at night-time and many escaped careful inspection. So far as the damage was "exteriorally recognizable," it was noted with the number of the rolls damaged but they were not able to "list each item of damage for each roll."

Respecting the condition of the paper upon its receipt by the American boats, there seems to be little dispute. The testimony of the ships' officers and the inspector and two tallymen with regard to what happened during the loading is not in complete accord. The officers of each of the American boats testified that in loading the rolls wire slings were used, and that it was noticed that these wire or chain slings were doing some damage to the outside wrappers of the rolls. Protests were made, and the stevedores said they were not equipped with rope slings and that it was not customary to use such in the port of Hamburg. In the case of the West Campgaw, the officer recommended, after about half of the cargo of paper had been taken on, that dunnage be used between the roll and chain, and that this was done, with the result that there was no further damage done to the wrappers

by the chains. The representatives of the Deutsche American Shipping Company, on the other hand, testified that no chain or wire slings were used in loading the rolls on to either of the vessels. I feel that the officers of the vessels, whose depositions were taken within three years after the events, could not have been mistaken about the use of the wire slings. This, however, might account for some of the damage done to the wrappers, but would not satisfactorily explain the condition of the contents of the rolls when delivered to Boston.

Regarding the use of hooks in loading, there is also conflict. The Chief Officer of the West Campgaw said that he saw hooks being used by the stevedores as they were putting the rolls on to the vessel. Upon his suggestion the stevedores stopped using them. All agree that instructions had been given the stevedores to be careful in handling the paper and in no case to use hooks. The representatives of the Deutsche American Shipping Company testified that, as far as their observations went, they saw no hooks being used while the paper was being loaded.

I cannot find from the evidence that any hooks were used after the paper came into the possession of the boats. One of the officers said he saw some of the rolls hit the hatch coaming as they were being let down into the holds of the boats, but that he could not say whether the paper had been damaged thereby, as such damage would not necessarily result.

A witness for the libelant, after test, claimed that the damage to the wet rolls had been caused by salt water. A witness for the United States, applying exactly the same test, found that the rolls had been wet with fresh water.

There was evidence tending to show that during the process of loading the paper, it was necessary to stop work on one or two days because of rain. According to the log, the hatches were covered at these times, and the loading was not in progress during the storm. Whether the rolls were properly protected on the barges before they had been put aboard the vessel is a matter upon which no finding of fact can be made.

It is my conclusion, in view of this evidence, that the dampness of the rolls had been caused by fresh water.

The appearance of many of the rolls before they had been loaded on the American boats indicated that the paper cargo had received rough treatment. There were in evidence photographs of the rolls after they had been discharged at Boston which presumably were specimens of the most badly damaged rolls, and these, so far as it was possible to trace them, were part of the lot represented by the bill of lading issued by the Swedish steamer Umlealf, which was, in part, transferred to the West Harcuvar while alongside the vessel. As already indicated, one of the vessels from which the West Harcuvar received the paper was not one of the vessels issuing the original bill of lading, from which it might fairly be inferred that the cargo had been transferred from one Swedish vessel to another before it had been delivered to the American vessel. There is no other evidence tending to show the earlier history of the shipments.

There was a slight attempt to establish negligence in the stowage of the cargoes in the West Campgaw. The evidence to that end was the unsupported recollection of witnesses who were testifying ten years after the transshipment. It does not overcome the testimony to the contrary, given in 1930, from which it appears that the holds were dry and that the paper cargo was properly stowed. I find that after the paper was on board the vessels, the carriers were not negligent in the performance of their duties during the voyages.

Both vessels arrived at Boston on the 22d day of January, 1927. The West Harcuvar began unloading at the Army Base on the same day. The impleaded respondent Jarka & Co. undertook the work of unloading that vessel. The West Campgaw did not begin unloading at Mystic Wharf until the following day, Sunday, January 23d. The impleaded respondent Booth was the stevedore in charge. When the cargoes had been discharged, it was found that over 1,600 rolls were damaged by hook holes, cuts, bruises, and water. Of these 648 were taken from the West Harcuvar and 1,028 from the West Campgaw.

On Monday, January 24, 1927, appraisers representing both the libelant and the libelee were sent to investigate while the cargoes were being unloaded. The representative of the libelant called the Yankee Line and complained that hooks were being used in the discharge of the rolls of paper from both vessels. Whether hooks were used is the issue of fact upon

which the witnesses do not agree. The great weight of evidence, however, is to the effect that the cargo was properly handled by the stevedores when it was being discharged.

The appraiser for the libelant testified that he saw workmen using hooks in breaking out the rolls from the lower hold. I am satisfied that he believed that this was being done, but it was, in my opinion, a belief based upon his observation of the condition of the rolls which' he had seen on the dock as well as in the hold. These rolls undoubtedly carried unmistakable indications of the use· of hooks and, acting upon what he had seen, he notified the agents of the Yankee Line that hooks were being used. No one else sent to investigate saw any hooks used. The use was denied by the officers of the vessels whose depositions were in evidence and was vigorously denied by the boss stevedores who supervised the work of unloading.

I make these ultimate findings based upon the foregoing:

1. That rolls of newsprint transshipped by the West Campgaw and the West Harcuvar were delivered in Boston in a damaged condition.

2. That rolls of newsprint were in the same damaged condition when taken over by the vessels, and the libelant has not proved its allegations that damaged rolls were received by the vessels "in apparent good order and condition."

3. That the evidence does not sustain libelant's burden of proving that those in charge of the libelee's vessels were negligent in respect to the stowage of the cargo of paper.

4. That the stevedores in charge of loading at Hamburg were responsible for injuries to some of the damaged rolls but not to all of them.

I find that whatever injury was done by them was done before the rolls had been received on board the vessel. °

It is not possible to find from the evidence whether these stevedores were acting for the libelee or for the Swedish vessels.

5. That the damaged condition of the rolls was not due to the negligence of the employee of either of the impleaded stevedores, E. S. Booth or Jarka & Co.

Two statements of deceased longshoremen were offered in evidence and were taken subject to later ruling on their admissibility. The first was in the form of a written report, made by a deceased timekeeper to his superior, who did not testify. The other was in the form of an affidavit under oath of a deceased stevedore employed by Jarka & Co. These statements are excluded.

### Conclusions of Law.

■ The ultimate findings of fact leave no questions of law respecting the liability of the impleaded stevedores Booth and Jarka & Co., or the liability of the United States as carrier, so far as relates to the stowage and discharge of the cargoes at Boston. As to these matters, no negligence has been shown for which the vessels can be held liable.

■ The question arises whether the vessels can be held for the damage, if any, that may have been done to the rolls while being loaded at Hamburg. I take it this would depend on whether the stevedores operating there were acting for the United States vessels or for the Swedish vessels. There being no evidence from which it can be determined who employed these stevedores, it cannot be presumed that they were acting for the owners of the American boats. Nor is the libelant helped by any presumption that the rolls, delivered in a damaged condition, were delivered to the vessels free from the defects shown to exist. Instead of representing that the cargo had been received in "apparent good order and condition," the representation was to the contrary. The Deutsche American Shipping Company, representing the vessels, made what they term "a general writing-off" on each lot. The significance of this, as I understand it, is that the cargo was received as damaged cargo, thus casting upon the libelant the burden of proving by fair preponderance of the evidence that the rolls, delivered in a damaged condition, were received by the vessels in a good and· sound condition. It seems to be settled law that in the absence of a representation, or admission, that the cargo was received in apparent good condition, it is an· essential element of libelant's case that he prove the receipt in good condition. The Isla De Panay, etc., 267 U.S. 260, 45 S.Ct. 269, 69 L.Ed. 603; The Arpillao (D.C.) 241 F. 282;

The Goyaz (C.C.A.) 3 F.(2d) 553; The Boveric, 1924, A.M.C. 1045; The Joseph J. Hock (C.C.A.) 70 F.(2d) 259.

The evidence goes no further than to create a possibility, perhaps even a probability, that some of the damage done to the rolls may have occurred while the rolls were being loaded on the vessels. It is purely a matter of speculation whether the rolls which arrived wet, with torn wrappers, and with hook holes, were delivered over the side of the vessels free from such defects.

It may be conceded on the authorities that if the shipowner had issued bills of lading or receipts containing statements that the goods represented thereby were received in "apparent good order and condition," it would be estopped to deny the truth of the statements in a proceeding brought by a buyer-consignee who acted upon the representation. Higgins v. Anglo-Algerian S. S. Co. (C.C.A.) 248 F. 386; Olivier Straw Goods Corp. v. Osaka Shosen Kaisha (C.C.A.) 27 F.(2d) 129; Sears v. Wingate, 3 Allen (Mass.) 103; See the Isla De Panay, etc., supra.

The fact that in the case of the West Harcuvar the agent reported by number 183 badly damaged rolls does not limit the general character of the "writing-off" indorsed on each bill of lading and each receipt. No presumption arises that the rolls not listed were in good order, nor can any representation to that effect be implied. The notation went to the whole lot of paper represented by each bill of lading and receipt. The Boveric, supra.

It is contended by the libelant that inasmuch as the paper was delivered in a damaged condition and it is impossible to determine how many of the damaged rolls were received in a good condition, the vessel must be held liable for the total loss. This contention is based upon Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 196, 79 L.Ed. 373. In that case, however, there was a representation that the cargo had been received in a good condition, and evidence showing that damage had directly resulted from the negligent failure of those in charge of the vessel to properly ventilate compartments in which the cargo was stored. Neither of these essential elements are present in the case at bar. In the Vallescura Case, the court states that: "If he [carrier] delivers a cargo damaged by causes unknown or unexplained, which had been *received in good condition* (italics supplied), he is subject to the rule applicable to all bailees, that such evidence makes out a prima facie case of liability." I do not understand that this case relieves the libelant from his burden of proving that the newsprint was received by the American vessels in a good condition where there is no representation, or admission, to that effect.

I have excluded the statements of the deceased stevedores. They were offered under the Massachusetts statute (G.L. [Ter.Ed.] c. 233, § 65) as declarations of deceased persons. This statute may be applied in civil cases in the federal court. American Railway Express Co. v. Rowe (C.C.A.) 14 F.(2d) 269.

The decision in the Rowe Case turned on R.S. § 721 (28 U.S.C.A. § 725) to the effect that the laws of the several states, with certain exceptions, are to be regarded as rules of decision in trials at common law. Since the act does not apply to suits in admiralty, it follows that such hearsay evidence is not admissible under the statutes. Cf. The William Jarvis, Fed.Cas. No. 17,697; The Independence, Fed.Cas. No. 7,014.

The provisions of 28 U.S.C.A. § 631, which deal with the competency of witnesses in any civil suit, do not relate to the admissibility of evidence in an admiralty suit. Downs v. Wall (C.C.A.) 176 F. 657.

While the admiralty courts do not adhere to strict common-law rules of evidence [Clarke S. S. Co. v. Munson S. S. Line (D.C.) 59 F.(2d) 423], I am not prepared to rule that the affidavit and report of persons not in the court are admissible. They do not come within the recent Act of June 20, 1936 (28 U.S.C.A. § 695 et seq.), relating to the admissibility of records, etc.

A decree may be entered dismissing the libel.