## PEW & SON *v.* LAUGHLIN.*

### (*District Court, E. D. Pennsylvania.* July 6, 1880.)

1. ADMIRALTY—CHARTER-PARTY—EFFECT OF MATERIAL ALTERATION.— A charter-party will be avoided by a material alteration made by one of the contracting parties, without the knowledge or consent of the other, after the paper has been signed by both parties, but before it has been delivered.

2. SAME—ALTERATION BY AGENT.—A charter-party signed by the captain was forwarded to the charterers, who signed it, and sent it to their agent for delivery to the captain's brokers. The agent, without authority from the charterers, and without the knowledge of the captain or owners, but with the knowledge of the captain's brokers, made a material alteration. *Held,* that the charterers could not enforce the charter-party.

3. EVIDENCE—INFERENCE BY WITNESS.—The assent of the captain or owners to such alteration is not sufficiently proved by the testimony of the ship's brokers that, under the circumstances, they must have obtained such consent, although they have no distinct recollection of so doing.

In Admiralty.

Libel by Pew & Son against Laughlin *et al.,* owners of the bark Robert Morrison, to recover damages for breach of a charter-party. The case was twice argued. On the first hearing a question arose as to the sufficiency of the proof of the execution of the charter-party, and libellant asked and obtained leave to take additional testimony. On the second hearing the case turned upon the effect of an alteration which had been made in the charter-party. The evidence disclosed the following facts: In June, 1875, the vessel was owned by four persons, one of whom, Thomas Gardner, was master of the vessel and sailed her on shares. Prior to June 25, 1875,

---

*Reported by Frank P. Prichard, Esq., of the Philadelphia Bar.

Gardner, with the knowledge of the other owners, had made a charter to carry oil to Ancona, and had accordingly loaded his vessel with oil at Philadelphia. He employed one D. S. Stetson, Jr., a ship-broker of Philadelphia, to obtain a charter for a return cargo to the United States. Stetson employed W. F. Hager & Co., ship-brokers of Philadelphia, who in turn employed John C. Seager, a ship-broker of New York.

The libellants, John Pew & Son, salt merchants of Gloucester, Mass., acting through their correspondents, J. P. & G. C. Robinson, salt merchants of New York, agreed with Seager to charter the vessel for a cargo of salt from Trapani, Sicily, to Gloucester. Hager & Co. thereupon wrote a charter, obtained captain Gardner's signature to it, and forwarded it to Seager, who gave it to J. P. & G. C. Robinson, who sent it, on June 26th, to libellants at Gloucester, with a letter stating that they thought the following clause in the charter, viz., "ten running lay days for loading at Trapani, and customary dispatch for discharging at Gloucester," should be altered so as to read, "customary dispatch for loading and discharging," but advising Pew & Son to sign the charter as it was, and authorize J. P. & G. C. Robinson to subsequently obtain the alteration if possible. Pew & Son thereupon signed the charter without alteration, and returned it J. P. & G. C. Robinson, but, owing to misdirection of the envelope, it did not reach J. P. & G. C. Robinson until June 3d. One of the latter firm then, without the knowledge or authority of libellants, made the alteration in the charter-party which had been previously suggested, so that it read "customary dispatch for loading and discharging."

This alteration was made in the presence of a gentleman connected with the house of John C. Seager, to whom J. P. & G. C. Robinson then delivered the charter. Seager, on July 3d, forwarded it by mail to W. F. Hager & Co., who furnished libellants with certified copies. The original remained in the possession of W. F. Hager & Co. until shortly before this suit was brought. In the meantime, about July 2, 1875, Gardner surrendered the command of the vessel, and the other owners appointed F. J. Fritzinger as captain, one of

the owners residing at Philadelphia becoming the managing owner. The vessel sailed from Philadelphia on July 3d, but did not proceed to Trapani, or load libellants' cargo. In January, 1878, libellants brought this suit. There was no direct evidence that either Gardner or any of the other owners knew of the alteration in the charter. W. F. Hager testified: "Before the copies were drawn I am positive that we must have received the approval of Mr. Stetson of the alteration made in the charter; otherwise we would not have sent them." And Mr. Stetson, upon having his attention called to this statement, testified: "I know it is a universal custom to do that thing, but I have no recollection of his having done so in this instance. If he had not done so I should have considered the whole thing a forgery." And, being asked whether he would have approved of the alteration without consultation with the owners, he testified: "I should have felt that I should have committed a forgery if I had not consulted the captain or managing owner. I don't remember the circumstances."

*Edward F. Pugh* and *Henry Flanders,* for libellant.

*J. Warren Coulston* and *Henry R. Edmunds,* for respondents.

BUTLER, D. J. The view I entertain respecting the execution of the charter-party renders unnecessary the consideration of any other question raised by the case. It may not be improper, however, to say that on examining the testimony as presented at the former hearing I found no serious difficulty in the libellant's way, except that which relates to the execution of the paper. My views respecting this question, as the evidence then presented it, were reduced to writing; but, as the libellant applied for permission to take further testimony, the opinion was not filed. It may not be uninteresting to insert it here, as preliminary to an examination of the testimony since taken:

"The execution of the charter-party is not proved. That Captain Gardner signed it, is shown; but that the libellant signed it, is not. The contract need not have been reduced to writing, in the absence of an agreement that it should be. But there was such an agreement, and until the paper was

fully executed neither party was bound. The libellant pro-
duces a paper signed by Captain Gardner, to which his name,
also, appears. That this is his signature, or that he author-
ized it to be put there, however, is not shown. The paper
was returned to Hager & Co., from New York, with the libel-
lant's name upon it. But this does not even tend to prove
that he put it there, nor does the deposition of Mr. Pew tend to
prove it. He signed *a* paper, he says, of which he attaches a
*copy* to his deposition. This 'copy' is found, on comparison,
to be similar to the paper in controversy, except in certain im-
portant erasures and alterations, which the latter shows, and
the 'copy' does not. But, even if we overlook this serious
difference, how can it be affirmed that the paper in contro-
versy is the *original*, signed by Mr. Pew, and not itself a
copy, also? The testimony is but *secondary* evidence of the
fact involved, and is therefore incompetent. If it were shown
that the original is lost, or beyond the libellant's reach, the
evidence would be admissible and sufficient; but in the ab-
sence of this it cannot be listened to. Had the paper in con-
troversy been exhibited to Mr. Pew, and his signature thus
proved, the difficulty would have been avoided."

On the case going back the paper was exhibited to Mr.
Pew, and he testifies to the genuineness of his signature.
But it now appears that when the paper came to him, exe-
cuted by captain Gardner, the important alteration before
referred to had not been made, but that it was made before
the paper left Mr. Pew's hands, (for his agent's hands were
his,) in advance of delivery; and I find no evidence that
the respondents assented to this alteration, or were ever in-
formed of it. The libellant's counsel say: "There is no direct
testimony as to whether the alteration was assented to by any
of the owners, but all the circumstances show, and all the
witnesses say, that it must have been assented to, though
owing to the lapse of time—about five years—they could not
remember." I do not, however, find any such such circum-
stances; and the expressions of the witnesses, referred to, fall
far short of the necessary proof. The purpose in reducing
contracts to writing is to secure the most satisfactory evidence

of their existence and terms—in other words, to avoid the serious dangers incident to parol testimony.

One who seeks to avoid the language in which such an instrument is drawn, as by proving the assent of parties to a change, or otherwise, must be held to full and satisfactory proof of the fact. Such proof can readily be secured by having the assent noted or distinctly expressed in the presence of witnesses who will remember it. Here there is no such evidence. The testimony of Messrs. Hager and Stetson amounts to nothing. Neither has any recollection on the subject. The statement of the first, that he "must have received the approval of Mr. Stetson to the alteration," is objectionable on the double ground that Mr. Stetson had no power to assent for the respondents, and that it is an inference simply which the witness cannot draw. The statement of Mr. Stetson that "it is a universal custom to do that thing—that is, to obtain the assent of the *broker* to an alteration in a charter-party—is of no consequence, because such assent, in the absence of authority to give it, as here, would be valueless; and his further statement that *if* Mr. Hager asked "my assent I should have felt that I would have committed a forgery *if* I had not consulted the captain or managing owner, but I do not remember the circumstances," is of as little consequence. It does not reach the dignity of evidence. Inference is built upon inference. Mr. Hager having inferred that he "must have obtained Mr. Stetson's assent," the latter infers (granted Mr. Hager did) that he obtained the captain's or owners'. Where inferences are admissible they are to be drawn by the court. Here we see no foundation for any that can aid the libellant. If written instruments might be avoided, or their terms changed, upon such testimony as the libellant here invokes, they would cease to be of value.

That the alteration materially changes the contract as originally written is not open to controversy. The letters of Robinson & Co. and Pew & Son show how important to the latter the change was considered. It is urged, however, that the alteration was not made until after the instrument had been fully executed, and that being then made without au-

thority from, or fault of, the libellant, it does not affect the contract as entered into by the parties. It is true that such an alteration (or, more accurately speaking, *spoliation*) would not affect the contractual relations of the parties. 1 Green. Ev. § 566. But, unfortunately for the libellant, this alteration, as already suggested, did not occur after the execution of the instrument had been completed. It is true, Pew & Son had signed the paper, but it still remained in their hands, (Robinson & Co. being their agents,) and was completely subject to their will. Until delivered, as the evidence of their contract, the execution was incomplete. It had been forwarded to them to sign and return to Hager & Co., who should hold it for the parties; and until this was done the transaction was not completed, and no responsibility on the part of the appellant attached. As Mr. Birch, clerk for Hager & Co. testifies, the vessel "would not be considered chartered unless the paper came back signed." It did come back signed, but, unfortunately, at this time it was not the same as when the respondents' representative, Gardner, signed it. As respects the libellant it speaks as of the date when (through their agents) they delivered it to Hager & Co. Thus it is seen that the alteration was not made *after* the instrument was fully executed; that it is not a case of *spoliation*, such as is referred to by the authorities cited; but, on the contrary, that the parties did not execute the same instrument, did not agree to the same thing, and consequently had no contract to which they were mutually bound. The only terms to which the libellant could be held are those shown by the paper when delivered by their agent, and these terms (to which the respondents did not agree) are the terms recited in the libel and here sought to be enforced.

The libel must be dismissed, and the respondents' counsel will prepare a decree accordingly.