## WILLIAM A. HIGGINS & CO. v. ANGLO-ALGERIAN S. S. CO.

(District Court, S. D. New York. June 30, 1915.)

1. SHIPPING ☞132(5)—INJURIES TO SHIPMENT—SUFFICIENCY OF EVIDENCE.

In a suit for damages to a shipment of dates, injured by water, evidence *held* to show that the injury was sustained while the dates were upon the lighters from which they were loaded and before they came aboard the ship.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 483, 484.]

2. SHIPPING ☞106—BILLS OF LADING—ESTOPPEL.

A recital, in a bill of lading given by a ship's agent, that a shipment of dates was received in apparent good condition, did not estop the ship to show that they were damaged by rain or spray before being loaded on the ship, though when so loaded they were not in apparent good condition, but were stained or discolored, as there could be no greater estoppel than if the recital had been true, in which case the estoppel would only have extended to the apparent condition of the shipment.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 226, 414–419.]

3. SHIPPING ☞142—INJURY TO SHIPMENT—LIMITATION OF LIABILITY—NOTICE OF DAMAGE.

There could be no recovery for damages to so much of a shipment of dates as was removed before notice of damage, where the bill of lading provided that such removal should be a waiver of all claims.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 496.]

4. ADMIRALTY ☞18—JURISDICTION—TORTS.

Whether a tort consisted in the issuance of a bill of lading, or in its negotiation, admiralty had no jurisdiction; both of such acts having occurred on the land.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 206–221.]

In Admiralty. Libel in personam by William A. Higgins & Co. against the Anglo-Algerian Steamship Company. Libel dismissed.

This is a libel in personam by the assignee of a bill of lading for damage done to part of a cargo of dates shipped on board the steamship Armiston from Bussorah, Persia, for New York during the first days of November, 1911. The steamer lay in the Bussorah Roads, and the dates were brought alongside in lighters, wrapped in oil paper and packed in wooden cases made of three-eighths inch boards. While the loading was going on, heavy tropical rains fell on Bussorah for several nights, drenching the lighters and wetting some of the dates so much that the master refused to take them and sent the lighters back. Some 25,000 cases, nevertheless, were shipped, among which were the 3,000 afterwards sold to the libelant. When they came over the side, the mate gave receipts, and in every case noted upon the receipt that the cases were stained by their own contents, or were discolored, or the equivalent. Whether the cases were actually wet by the rain on the lighters does not appear from the testimony of the ship's crew.

When the loading was complete, the ship's agent, at the request of the shippers, gave them a "clean" bill of lading, which read, "Apparently in good order and condition." In the fine printed portion of the bill of lading, however, there appeared this clause: "Mate's receipts to be conclusive evidence of the quantity of and condition in which goods are received by this company from river steamers and craft." In order to procure this "clean" bill, the shippers gave to the ship's agents at Bussorah a contract of indemnity holding them harmless for all consequences arising therefrom.

When the dates arrived in New York, they were placed upon the pier, and it was there found that out of 3,000 cases about 2,000 had been damaged.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Of these 2,000 the casings of 440 were stripped, and it was finally ascertained that some water damage had happened to about 500 in all; but whether the damage was from salt or fresh water is in dispute. More than 1,000 of the cases were removed by the libelant without notice of damage, the bill of lading containing a provision that such removal should be a waiver of all claims.

The master, carpenter, and the mate of the Armiston were examined, and testified without contradiction that the hatches were closed during the heavy rains at Bussorah, and that they had examined the holds and found them clean and dry before the loading began. At Muscat more cargo was taken in fine weather, and the ship had no trouble till she passed Gibraltar. In the Atlantic she experienced unusually heavy weather even for December, and for some days labored heavily and took on board large sea; but no hatches were broken open, and there was no evidence of damage to the cargo. The weather was very cold, and when the hatches were opened in New York it transpired that the holds had sweat, but the sweat did not appear to be enough to cause the damage to the dates, although some cargo was damaged in each of the holds except No. 3.

James A. Martin, of New York City, for libelant.
John M. Woolsey, of New York City, for respondent.

LEARNED HAND, District Judge (after stating the facts as above). [1] In spite of the very reasonable skepticism with which courts regard the proof of a ship's crew in such cases as this, there is no just reason to disregard their testimony, which stands quite unimpeached and which is not contradicted by any inferences necessarily to be made from the evidence touching the dates before they came aboard. Whether they got wet in the lighters while alongside, or whether they were wet before the lighters got them, does not appear; but that they were damaged is certainly the case, and that they were damaged by the rain is certainly favored by all the probabilities. Upon the issue of whether they were wet by salt water I find against the libelant; that is, if they were wet by salt water I think it was not on the ship. The only reason to suspect salt water is that Kemp found a salt reaction by nitrate of silver, but a trace would be enough for that, and salt may grow in the dates or it may get on them in the lighters. All the other witnesses say that the damage was not from salt water, and Kemp was not very certain upon cross-examination. Therefore I find that the dates were not injured by sea water while on the ship.

The only other possible water damage which could have reached them is from the sweat of the holds, but the libelant lays little stress upon this. That the holds did sweat is true enough, and some of the water may have fallen on the cargo; but it is hard to see why, if this was the cause, the Muscat dates should all have come off uninjured, while the Bussorah dates which came aboard discolored and after exposure to foul weather should be injured. Certainty is perhaps not possible, but the likelihood is very strong that the damage did not happen from sweat. I therefore find that the damage occurred through the wetting of the dates either by rain or by sea water before they came aboard and while upon the lighters. As the bill of lading contained an exception against liability for damage from rain or spray or for risks of lighterage, it follows that there is no liability under the contract of carriage.

[2] To meet this difficulty, the libelant relies upon the doctrine of estoppel, and insists that the words of the bill of lading, "in apparent good condition," are not qualified by the clause giving effect to the mate's receipts. I shall accept their position for the purposes of the case and consider it as though the bill of lading created a complete estoppel. What is the ship estopped to assert? Certainly no more than that the goods were in apparent good condition. I cannot see that this should be extended so as to forbid their showing that they were actually damaged by rain or spray and that such damage was excepted from the bill of lading. To give such a bill of lading is in my judgment a tort, for which the libelant has a remedy; but I am now considering simply the ship's liability in contract, to be worked out through an estoppel. It is no doubt unfortunate that, owing to our complicated jurisdiction, I cannot give a remedy upon that tort; but I cannot, and the distinction is therefore vital. If the libelant proceeds by estoppel, the limit of the estoppel is that the ship shall be held to the words used. Obviously, if the cases had not been stained or discolored; if the goods had in fact been in apparent good condition, the ship could have proved that they were wetted by the rain or by spray while in lighters and that the ship was excused under the exceptions of the bill of lading. How can the estoppel put the ship in a worse position than if the statements had been in fact true?

In England the law must be conceded to be in doubt, though I believe that it is in accordance with what I have said. In Campania Naviera Vasconzada v. Churchill (1906) 1 K. B. 237, Channel, J., decided that the ship was estopped by a bill of lading which had the words "in good order and condition." The case involved lumber stained by oil while at the shipper's risk, and the damage was apparent to the master who signed the bill of lading. The decision proceeded upon the theory that, as the ship was estopped to show that the lumber was not in good condition, it could not show that it had been damaged before the ship received it, and could not therefore sustain its burden as carrier of showing that it was not liable. I cannot find that the ship attempted the line of defense that, even if the lumber was damaged while in its custody, the damage was within the exceptions of the bill of lading, and this no doubt was impossible, as the estoppel went beyond the apparent condition of the goods and affected their condition in fact, from which followed the conclusion that they had been damaged while in the ship's custody, a damage the ship could not excuse.

However, in Martineaus, Ltd., v. The Royal Mail, etc., Co., Ltd., 17 Com. Cases, 176, Scrutton, J., who was of counsel for the ship in the case just cited, had before him a bill of lading containing the words "in apparent good condition." The cargo was sugar which the owner of the bill of lading acknowledged had got wet before it came to the ship. Scrutton, J., reasoned that, since the ship was estopped to say that the goods were not in apparent good condition, it was inconsistent with that estoppel to allow them to show that the damage had come from external causes, and that the ship could not prove that an excepted peril had caused the damage. I cannot in the least distinguish this case from the case at bar, except for the clause

about mate's receipts, which I disregard (Crooks v. Allen, 5 Q. B. D. 38, 40), and 1 can only say with great respect that it seems to me to confuse the wrong done by uttering a false bill of lading with the liability of the ship upon its contract. If the ship could not have proved the wetting of the cargo had the apparent condition been in fact good, then the decision would be without question; but no one could assert that. If it be urged that the cargo could not have been wet without showing it, I should say that that was irrelevant; but, irrelevant or not, it has no application to the case at bar, because no one has connected the discoloration of the dates with their being wet, and, indeed, the mate sent away all lighters which he supposed to have got wet.

The House of Lords, in Crawford v. Allan Line, [1912] App. Cases, 130, expressed an opposite opinion, I think, at least in the judgments of Lord Atkinson and Lord Gorell. In this case flour had been shipped from Minneapolis to Glasgow under a through bill of lading which contained the words, "in apparent good condition." The flour was wet in New York before it reached the ship, and the first question was when the estoppel spoke, which the court fixed at the date of its receipt by them. Having imposed an estoppel upon the ship because it gave the unconditional receipt under such a bill of lading, it was necessary to determine the effect of the estoppel, and in the judgment of Lord Atkinson and Lord Gorell it abundantly appears that they supposed the ship might show that the damage arose from a wetting previous to its receipt by the ship, and that the ship was excused. The Lord Ordinary of first instance had found against the ship in both these particulars, and the House of Lords accepted that finding. I think that this case at least leaves it open to doubt whether the decision in Martineaus, Ltd., v. The Royal Mail, Ltd., supra, expresses the law in England.

[3] In any case there could be no recovery for so many of the cases as were removed before notice. The Persiana, 185 Fed. 396, 107 C. C. A. 416.

[4] While therefore the libelant fails upon this proceeding, I have no doubt that to utter such a bill of lading is a tort, since it is an utterly unjustifiable fraud. The excuse that a bill of lading is not negotiable has no merit whatever, nor have any of the authorities cited any bearing on a case where a false statement is deliberately inserted to be acted upon by innocent third persons. To allow the ship to escape liability under such circumstances would be intolerable. Nothing could more clearly show the corrupt purpose of the parties than the indemnity agreement itself. There are two reasons, however, which prevent any recovery in this case upon that theory. The first is that the libel must be amended to set up a new cause of action, which it is perhaps too late now to do. The Burma, 187 Fed. 94, 110 C. C. A. 330. The second is that this is an admiralty court only and would have no jurisdiction over such a case if the libels were amended, because the bill of lading was issued at Bussorah, if that be the wrongful act, and negotiated in New York, if the wrongful act be its negotiation. One of these acts was a tort, but a tort on land, over which admiralty has no jurisdiction. Williams v. Providence Washington

Ins. Co. (D. C.) 56 Fed. 159. It is not necessary to consider whether in any event admiralty would have jurisdiction over a deceit committed on the high sea.

The libel is dismissed, without costs.