**THE CARSO (five cases).**

District Court, S. D. New York.
July 17, 1930.

Single & Single,' of New York City (Gregory S. Rivkins, of New York City, of counsel), for libelants, Mollinelli, Giannusa & Rao, Inc., et al.

Harry D. Thirkield, of New York City, for libelant Kurtz.

Loomis & Ruebush, of New York City (Homer L. Loomis, of New York City, of counsel), for the Carso and owner.

WOOLSEY, District Judge.

My decision in these cases is for the libelants.

I. The five cases are similar in their facts and were tried together.

The libels are all based on contracts of carriage arising from the shipment of cases of cheese on the steamship Carso at Naples in September and October, 1926, and the issuance of bills of lading by the respondent therefor agreeing to transport the several shipments from Naples to New York.

Seventeen of the bills of lading here involved were straight bills of lading with named consignees providing for delivery to them or their assigns; three were order bills of lading. For the reasons hereinafter set forth, however, I think this difference is immaterial.

Eight of the bills of lading were dated September 29, 1926, and twelve were dated October 2, 1926. Some of the bills of lading were dated before the goods got on shipboard, presumably to enable the shippers to comply with their sales contracts. Owing to the view I take of these cases it is, however, unnecessary for me to discuss that question.

The cheese originated in the Island of Sardinia, and was transported thence to Naples by a coastwise steamer, put on board lighters at Naples, and, taken from the lighters, was shipped by the sellers on board the Carso.

Each bill of lading contains the recital that the cases of cheese involved were *"shipped in apparent good order and condition."*

The cases of cheese were purchased through a commodity broker, Henry Scaramelli-Bianco-Capolino Corporation, which had an office in New York and also an office in Naples.

The contracts of sale, after naming the buyer and seller and the brand and amount of cheese, provide the terms of the sales material here as follows:

"F. O. B.—Naples

"Shipment—to New York. If possible 3 shipments of 25cs. each; otherwise 2 shipments, beginning and end of September 1926.

"Terms—Drafts at 60 days from date of B/L, subject to ruling of the Italian Treasury Dep. referring to omission of time drafts in lire, or sight letter of credit lire at the option of the buyer.

"Insurance—Covered by the buyer

"Special Instructions: Shipment via New York.

"Conditions—The responsibility of the seller, ceases after obtaining clean receipt from carrier, subject to rules and conditions of the bill of lading issued by said carrier. * * * "

The contracts of sale were similar, for present purposes, to the contract involved in the case of J. Aron & Co. v. Steamship Kerlew (D. C.) 43 F.(2d) 732, 1924 A. M. C. 560, 563, hereinafter discussed, where the sugar involved was bought f. o. b. Hamburg.

The shipowner took depositions in an attempt to show that the damage suffered by the cheese occurred on shipboard, and was due to causes within some of the exceptions of the bills of lading. The depositions, however, did not bring the damage within any of the bill of lading exceptions. All the boat notes were produced during the taking of the depositions and all but two of them show that the cases were in bad condition when received. Some of the cases were noted as "stained by contents," others as "flimsy," and others as "old and recoopered," and some as "broken."

Furthermore, the evidence taken on the trial, including the expert evidence, points

conclusively to damage which must have occurred before shipment.

It has not been proved in this case, however, although it was suggested, that the shippers gave the steamship company letters of indemnity, and in that respect the case differs from some of the other reported cases.

The evidence satisfies me, and I find, that the damage was what is known as "country damage" and occurred before the cheese was shipped at Naples. I am also satisfied and find that the cases of cheese, with the slight exception of those covered by the two boat notes above mentioned, were not "in apparent good order and condition" at the time of the shipment and, consequently, that the receipt in the bills of lading for those cases as *"in apparent good order and condition"* was not a true statement of their condition as known both to the seller-shipper and to the shipowner or its agents at the time of shipment.

When they accepted the drafts provided for in the sales contracts, the buyer-consignees, libelants here, did not know that the representations as to condition were false, but relied on the fact that clean bills of lading were presented to them with the drafts and accepted the drafts on that footing. When the drafts were paid, on their due dates, however, the damage was known to the consignees.

The question to be determined here, therefore, is:

Whether, if the shipowner gives a clean bill of lading for cargo which it knows is not in good condition, and the buyer-consignees, acting in reliance on that bill of lading and without knowledge of the condition of the cargo, accept drafts to cover the purchase price of the cargo, the buyer-consignees are entitled to recover in an action against the steamship and its owner when they have paid the drafts after learning of the damage.

II. Summarized, the situation is that the libelants, by showing a receipt by the shipowner for the goods as in apparent good order and condition and by proving a delivery in damaged condition, have made out a prima facie case for a recovery of the damages both in rem against the steamship and in personam against its owners.

From this case the shipowner seeks to escape thus:

First, it claims that the damage fell within the exceptions of the bills of lading.

In this it failed, and that disposes of the cases of cheese covered by the two boat notes above mentioned which did not show damage.

Second, it claims that the goods were not damaged whilst in its custody. It is precluded from establishing this defense by the doctrine of estoppel hereinafter discussed.

Third, it says that there is not any jurisdiction in admiralty if the case turns on false representations. The answer to this is that the suits are on maritime contracts and the only effect of the misrepresentations is to preclude a defense, not to found a cause of action.

Lastly, it says the libelants have not complied with the notice clause. It fails here under the authorities hereinafter mentioned which control my decision, and also because, for reasons to be given, the notice of claim clause in these bills is unreasonable in its initial provision which is an integral part of it.

III. The application of the doctrine of estoppel to bills of lading and warehouse receipts in cases where courts have found that injustice was being perpetrated by false statements contained in them is not very ancient.

In Bradstreet v. Heran, 2 Blatchf. 116, 3 Fed. Cas. page 1183, No. 1792a, Mr. Justice Nelson, sitting on circuit here, dealt with the doctrine in a case of "country damage" to cotton which had developed and showed itself on the shipment of the cotton at New Orleans.

In affirming the decree of the District Court allowing an offset for the damage to the cotton against a claim for freight, Mr. Justice Nelson, in connection apparently with a straight bill of lading, said at page 1184:

"What is termed 'country damage' arises, in many instances, out of the condition of the cotton at the time it is baled, being wet, or not properly fitted for transportation, and is invisible to the eye on inspection at the time of shipment. But, in this case, the weight of the evidence shows satisfactorily that the effects of the 'country damage' upon the external state of the cotton were developed at New Orleans before the cargo was put on board, and that the master was negligent and inattentive to its shipping order in this respect or he would not have accepted it as 'in good order and well-conditioned.' * * *

"The consignees made large advances upon the cotton, on the faith of the representation in the bill of lading that it was shipped in good order. They were justified in doing so, and their security should not be lessened or impaired by permitting the master to contradict his own representation in that instrument. It might be otherwise if the question arose between the master and the owner of the cotton."

The next case in order of time seems to have been Sears v. Wingate, 85 Mass. (3 Allen) 103 (1861), which involved a straight bill of lading, the relevant parts of which read as follows: "Shipped in good order, by N. Sturtevant & Co., in and upon the schooner called the Sylvanus Allen, of Dennis, whereof Grafton Sears, Jr. is master, now lying in the River· * * * of Philadelphia, and bound for Boston, Mass., Four Hundred and Three Tons Peach Mountain Coal (as per margin) which I promise to deliver in like good order at the aforesaid port of Boston (the dangers of the sea only excepted), unto Wm. A. Wingate, or to his assigns, he or they paying freight for the same, at the rate of $1^{86}/100$ dollars per ton."

On August 2, 1859, the defendant Wingate negotiated for a cargo of coal from Sturtevant & Company, of Philadelphia, who shipped it to him on board the plaintiff's vessel. The bill of lading was dated August 5th and was received by Wingate on August 8th, when he paid for the 403 tons of coal by a four months note.

The captain did not weigh the coal in Philadelphia but delivered all the coal he had on board. When the vessel arrived at Boston on August 18th, it was found that the coal consisted of slightly upwards of 391 tons.

The defendant, having pledged his credit to his seller in Philadelphia for 403 tons, deducted the shortage in the tonnage from the freight and paid the freight less the amount of such shortage. The master of the schooner then sued for the balance of the freight.

Mr. Justice Hoar, in a considered dictum, said at page 107:

"We therefore think that the rules which must govern the case at bar are these:

"First. The receipt in the bill of lading is open to explanation between the master and the shipper of the goods.

"Secondly. The master is estopped, as against a consignee who is not a party to the contract, and as against an assignee of the bill of lading, when either has taken it for a valuable consideration upon the faith of the acknowledgments which it contains, to deny the truth of the statements to which he has given credit by his signature, so far as those statements relate to matters which are, or ought to be, within his knowledge.

"Thirdly. When the master is acting within the limits of his authority, the owners are estopped in like manner with him; but it is not within the general scope of the master's authority to· sign bills of lading for any goods not actually received on board.

"In applying these rules to the case before us, we are met with the objection, on the part of the plaintiffs, that the defendant was a party to the bill of lading, and that the shipment was made on his account. If this were so, it would be decisive of the case, and the statements in the agreement of the parties are not very precise or clear respecting it. If the consignor were merely the agent of the consignee, their rights would be the same, and Berkley v. Watling [7 A. & E. 29] would be exactly in point. But in the agreed statement of facts it is only said that the defendant 'negotiated for a cargo of·coal from Sturtevant & Co.' before the shipment, and it does not appear that the purchase was completed or the property passed, until the bill of lading was received, and the payment made."

The effect of Mr. Justice Hoar's dictum was merely to lay down the scope of the principles within which he was operating, and the case went off on the point that the master had not had an opportunity of weighing the coal when it was shipped and that all the coal which the schooner had received at Philadelphia was delivered in Boston.

In McNeil v. Hill, Woolw. 96, 16 Fed. Cas. page 325 No. 8914 (1865), Mr. Justice Miller, sitting on circuit, had before him the case of a warehouse receipt for goods which had not actually been stored. The defendant warehouseman offered to prove he had never received the property. In holding that the evidence was not admissible, Justice Miller said:

"When a warehouseman issues such a receipt, he puts it in the power of the holder to treat with the public on the faith of it. He enables him to say, and to induce others to believe, that he has certain property, which he can sell or pledge for a loan

of money. If the warehouseman gives to the party who holds such a receipt a false credit, he will not be suffered to contradict the statement which he has made in the receipt, so as to injure a party who has been misled by it. That is within the most exact definition of estoppel. * * *

"The defendant here offers to prove that he never received the property mentioned in the receipt which he has given, but that the paper was issued as a security for a loan, or as an advance on wheat to be delivered. But he has stated in this receipt that he has the wheat in his warehouse, and also promised therein to deliver the wheat to the order of Upham & Co. These plaintiffs, believing this statement to be true, and relying on this promise, bought of Upham & Co. the receipt and property mentioned therein. They were justified in doing this, and the defendants must respond to their promise."

The dictum in Sears v. Wingate was quoted at length with approval by Mr. Parsons at page 190 in his well-known Treatise on the Law of Shipping, published at Boston in 1869, and was referred to by one of the judges of the Scotch Court of Sessions in the case of Craig & Rose v. De Largy, 16 Scottish Law Reports, 750 (1879).

That case involved a bill of lading for a shipment of olive oil and provided for delivery to order or assigns and receipted the goods as "shipped in good order and well-conditioned," and it was agreed that the steamship should carry the goods from Bougie, Algeria, to Leith.

The damage complained of was due to leakage from weak casks whose insufficiency was known to the captain. The cargo had been bought in reliance on the bill of lading representation as to its condition. The Court of Sessions based their decision against the cargo owner on the fact that there was a handwritten clause in the bill of lading "not responsible for leakage," and it was held that this notation put the indorsees of the bill of lading on inquiry, and that, consequently, it was not a clean bill of lading.

At page 758, Lord Shand referred with special approval to the dictum above quoted from Sears v. Wingate which he had found in Parsons on Shipping.

The reason for dealing at such length with the cases of Sears v. Wingate and Craig & Rose v. De Largy is that the dicta of Mr. Justice Hoar and of Lord Shand, respectively, in those two cases seem to have determined the decision of Mr. Justice Channell in the leading case on this subject, Compania Naviera Vascongada v. Churchill & Sim, 11 Com. Cas. 49, 59 (1905).

In that case Mr. Justice Channell had before him an order bill of lading which stated that the goods involved had been "shipped in good order and condition." He allowed a recovery of the full damages to the goods, 11 Com. Cas. 62, 63, and held that payment of money by the indorsees of the bill of lading, coupled with the trouble and possible expense of establishing a legal right to get it back, would amount to an act by the buyer to his prejudice sufficient to establish an estoppel against the person in reliance on whose statement payment was made.

The next case in point of time appears to be Martineaus, Ltd., v. R. M. S. P., Ltd., 17 Com. Cas. 176 (1912), in which Mr. Justice Scrutton followed Justice Channell's decision just mentioned in a case where sugar had been receipted for "in apparent good order and condition," although it was shown by the mate's receipt that it had noted as "very wet and stained by contents" on shipment and, hence, that it had been damaged before shipment.

The importers, Messrs. Martineaus, had paid part of the purchase price only, on receipt and acceptance of bills of lading, and though they did not resist further payments, Justice Scrutton held that estoppel existed, making the following significant remarks on page 180 (italics mine):

"But in my view they had acted on the documents to their prejudice; they had accepted the bills of lading and begun to pay for them, and if they were to resist further payment they must prove that the damage happened before shipment contrary to the statement in the bill of lading. *If the bills of lading had contained the mate's statement they would have been warned and could have resisted payment.*"

The case of Crawford & Law v. Allan Line, 1912 App. Cas. 130, which I very well remember because I took the evidence on behalf of the steamship company on an open commission here, was decided against the ocean carrier on a through bill of lading for bags of flour from Minneapolis to Glasgow because the ocean carrier had failed to notify the last rail carrier at New York—except in respect of a few bags—of the damaged condition of the bags of flour due to caking which existed when the flour was put on the ocean steamer at New York. The bill of lading required the ocean carrier to notify the rail carrier of any such damage, and it was therefore held that, not having done so, the

ocean carrier should be deemed to have admitted receipt of the bags *"in apparent good order and condition"* and that, having delivered them damaged, it was liable to the holders of the bill of lading.

With the law in this condition on this very interesting question, the case of Higgins v. Anglo-Algerian S. S. Co., Ltd. (D. C.) 242 F. 568, came up and was tried by Judge Learned Hand. The bill of lading provided for delivery at New York "unto order of his or their assigns," and recited the shipment of the goods "apparently in good order and condition." The shippers had given letters of indemnity, and whilst Judge Hand condemned the practice as a fraud on the indorsee of the bill of lading, he dismissed the libel, holding that the doctrine of estoppel laid down by the English cases in the lower courts should not be followed because he considered that some of the speeches by the Law Lords in Crawford v. Allan Line, [1912] App. Cas. 130, showed a different opinion, and that they had put the decision of the case on its peculiar facts.

On appeal Judge Hand's decision was reversed by the Circuit Court of Appeals, Higgins v. Anglo-Algerian S. S. Co., Ltd., 248 F. 386 (1918). Judge Ward, in his opinion for the Circuit Court of Appeals, followed the doctrine of estoppel laid down in the British cases above discussed, holding that in effect the shipowner had committed a fraud by issuing a false bill of lading, and, consequently, could not even avail itself of the notice of claim clause therein contained.

Judge Ward said at page 388:

"It is to be noted that in all the foregoing cases the statement, though untrue, was the result of negligence, or misunderstanding, or mistake; whereas, there can be no other explanation of the carrier's conduct in this case than that it was willing to assist the shipper in misleading subsequent holders of the bill of lading, provided he agreed to hold it harmless for so doing. Although a bill of lading is only a quasi negotiable instrument, we are not impressed by the argument that, because the carrier could have set up this defense against a shipper, it can set it up against the subsequent holder of the bill of lading, who was intended to be misled, because he is the assignee of the shipper."

Then in 1922 came the case of The Isla de Panay, 8 F.(2d) 91, 1923 A. M. C. 24, which was tried by Judge Augustus Hand.

The Isla de Panay Case involved a bill of lading which had two somewhat unusual characteristics. First, it was a straight bill of lading to a named consignee without any power of assignment, and, second, it did not contain any statement whatever as to the condition of the goods when shipped.

An examination of the record on appeal in the Isla de Panay Case shows that, so far as here relevant, the bill of lading therein read as follows: "M. Rowlett and Pyman has shipped on board the Spanish steamer Isla de Panay, its Captain M—— with destination to New York and consigned to Austin Nichols the effects declared on back, on the following Conditions."

Letters of indemnity were given by the shippers to a coastwise steamer Mogador, owned by the same owner as the Isla de Panay, to secure these bills of lading free from notation of the condition of the goods.

Judge Augustus Hand's short opinion dismissing the libels 8 F.(2d) 91, 1923 A. M. C. 24, is as follows:

"Libellants are consignees of shipments of olives under clean bills of lading. The bills of lading were signed in Seville, Spain, and the olives were loaded on the ship at Cadiz. These bills did not in terms contain any statement as to the apparent condition of the goods shipped and embraced a clause that the ship should not be responsible for 'breakage of the articles and fragile containers.'

"I think the great weight of evidence is to the effect that the chestnut casks containing the olives were old and insufficient at the time the merchandise left Seville for transshipment to claimant's vessel at Cadiz. The steamship agents distrusted the containers and insisted upon an agreement of indemnity as a condition of carrying the merchandise under clean bills of lading, which seems to have been given at Seville. There is no evidence of bad stowage or really unusual weather, or of an unseaworthy vessel, but the evidence is quite to the contrary. Nor is there proof of any handling by the stevedores at New York which should cause damage if the olives had been in proper casks.

"The libelants paid drafts accompanying the bills of lading without knowledge that the containers were old and insufficient. If there is any liability here for damages it is upon the theory that by failing to note in the bills of lading any insufficiency in the containers, the steamship misled the libellants to their injury and is now estopped under the doctrine of Higgins v. Anglo-Algerian Steamship Co. (C. C. A.) 248 F. 386, to claim that the containers were insufficient. In that case, however, there was in the bill of lading an

express representation that the merchandise itself was in apparent good order and condition, when it was known to be injured by rain water. Here the parties believed doubtless that the olives would go through, but the ship's agents were not willing to take the risk of any liability which might arise from old casks. No case has gone so far as to hold that a bill of lading containing no words representing the condition of the containers would give rise to an estoppel. The Harter Act expressly provides that the vessel shall not be liable for any 'insufficiency of package.' "

The dismissal of the libels against the Isla de Panay was affirmed by a Circuit Court of Appeals, consisting of Judges Rogers, Hough, and Mayer. The Isla de Panay (C. C. A.) 292 F. 723 (1923).

A careful consideration of Judge Rogers' opinion, read in the light of the record on appeal, and the briefs of counsel for the parties, convinces me that if the bill of lading in the Isla de Panay had contained the representation of condition which was found in the Higgins Case, the decrees below would have been reversed in spite of the fact that a straight bill of lading was involved.

After quoting from the Higgins Case, Judge Rogers thus ends his opinion at page 734:

"In the Higgins Case the bills of lading recited that the shipments had been received in good condition. In the instant cases the bills of lading contain no representation as to their condition one way or the other, and the distinction is vital."

Certiorari was granted by the Supreme Court, 263 U. S. 697, 44 S. Ct. 133, 68 L. Ed. 512. The argument in that court resulted in a decision, with three justices dissenting, which affirmed the courts below in their dismissal of the libels. The Isla de Panay, 267 U. S. 260, 273, 45 S. Ct. 269, 69 L. Ed. 603 (1925).

In the Supreme Court the opinion of the court in The Isla de Panay turned—as I believe it did in the Circuit Court of Appeals—entirely on the fact that the bill of lading did not contain any recital of the condition of the goods when shipped, and Mr. Justice McReynolds ended his opinion, as Judge Rogers did in the Circuit Court of Appeals, by distinguishing the case from the Higgins Case.

Mr. Justice McReynolds said, 267 U. S. 273, 45 S. Ct. 269, 272, 69 L. Ed. 603:

"Higgins v. Anglo-Algerian S. S. Co., supra, is essentially different from the present cause. There the bill of lading expressly recited that the merchandise had been received in good order and condition, and the ship was seeking to escape liability by setting up its own wrongful action."

Mr. Justice Sutherland, with whom the Chief Justice and Mr. Justice Van Devanter concurred, wrote in his dissenting opinion, 267 U. S. 273, 45 S. Ct. 269, 272, 69 L. Ed. 603:

"I am unable to agree with the opinion just delivered. It seems to be conceded, but in any event I think it must be conceded, that if the bills of lading had contained a recital that the merchandise was received in good condition the ship would have been estopped from asserting that in fact it was in bad condition. Higgins v. Anglo-Algerian S. S. Co., 248 F. 386, 160 C. C. A. 396. Here, I think, the circumstances are such as to make the omission of a recital upon the subject the equivalent of a statement of good condition."

On page 275 of 267 U. S., 45 S. Ct. 269, 273, he said:

"Consignees had instructed their bankers in Spain to pay the purchase price of the goods only upon presentation of clean bills of lading, and there is evidence to the effect that if bills are issued with a notation of bad condition they will not be accepted by insurance companies or bankers in Spain, but if such note be omitted they will pass, upon the assumption that the goods have been shipped in apparent good order and condition. Upon this assumption, the bills were passed and payment made. Under these circumstances, the omission of the notation in respect of the condition of the goods was nothing short of a suppression of the truth in order to further the fraudulent designs of the shippers. Upon every principle of fair dealing it should be regarded as the equivalent of a false notation of good condition which the ship is estopped to deny as against the claims of the consignees who relied upon it. To hold otherwise is to permit the wrongdoer to take advantage of his own misconduct, which a court of admiralty cannot allow with due regard for those equitable principles by which it is governed."

It is as clear as possible, it seems to me, that The Isla de Panay Case would have been reversed in the Supreme Court if the bill of lading involved had contained the usual recital as to the condition of the goods on shipment, and that the fact that it was a straight bill of lading to a named consignee played no part in the results of the case.

Meantime, whilst The Isla de Panay was

awaiting argument on the docket of the Supreme Court, Judge Goddard decided in this court the cases of The Kerlew and The Mette Jensen, 43 F.(2d) 732, 1924 A. M. C. 560, in which was involved a purchase of sugar by J. Aron & Co., f. o. b. Hamburg, paid for there by letters of credit requiring clean bills of lading. In those cases order bills of lading reciting that the sugar was "shipped in apparent good order and condition" were issued in exchange for letters of indemnity exacted by the steamship company because of the frail nature of the cases in which the sugar was packed. Judge Goddard followed the principle of the Higgins case and held the steamships on libels in rem.

The principle of estoppel by representation as to the condition of goods in a bill of lading was again enforced by Mr. Justice Wright, of the King's Bench Division of the British High Court in Evans v. James Webster & Bro., Ltd., 32 Lloyds List Reports, 218 (1928), under somewhat unusual circumstances. Cf. also Silver v. Ocean S. S. Co., 35 Lloyds List Reports, 50, 51, 52, 55, 57 (1929).

In Olivier Straw Goods Corp. v. Osaka Shosen Kaisha, 27 F.(2d) 129 (1928), the Circuit Court of Appeals for this circuit, in holding a steamship company liable because it issued a "Received for Shipment" bill of lading before the goods were actually taken on board the ship, said, speaking through Judge Augustus Hand, at page 133:

"When a carrier has given a clean bill of lading, stating that cargo has been received in good order, though it was at the time manifestly damaged, the courts hold that it is estopped to deny the truth of the assertion against a purchaser of the bill of lading, who has been misled by the representation and has altered his position to his detriment on the faith of the representation. Compania Naviera Vascongada v. Churchill & Sim (1906) 1 K. B. 237; Martineau, Ltd. v. Royal Mail Co. (1912) 17 Com. Cases, 176; Higgins v. Anglo-Algerian S. S. Co., 160 C. C. A. 396, 248 F. 386; Relyea v. New Haven Rolling-Mill Co. (D. C.) 75 F. 420; Bradstreet v. Heran, Fed. Cas. No. 1792a; Sears v. Wingate, 85 Mass. (3 Allen) 103. We can see no difference in principle between a misrepresentation as to the condition of merchandise and a misrepresentation that it is on board, when it is not. Either furnishes a basis for an estoppel.

"In The Isla de Panay, 267 U. S. 260, 45 S. Ct. 269, 69 L. Ed. 603, the Supreme Court seems to have sanctioned the doctrine of Higgins v. Anglo-Algerian S. S. Co., supra, though the case was distinguished on the ground that in The Isla de Panay a failure to note on the bill of lading that cargo was damaged caused no estoppel, as it was not accompanied by a statement that the goods were received in good order and condition."

The foregoing citations fairly summarize, I believe, the history of the growth of the principle of estoppel as applied to recitals in ocean bills of lading.

IV. The present cases, as is expectable, involve facts that do not fall precisely within any of the decided cases so far as I am aware, but I feel that they are embraced by the principle that has been developed as above outlined.

Here we have straight bills of lading involved in all except three shipments, though in none is the bill of lading as simple in form as in the Isla de Panay, for here, though the consignee is named, the bills of lading are all assignable.

Here we have a recital that the cases of cheese were in apparent good order and condition when shipped—a representation that was lacking in The Isla de Panay.

Here we have not any letters of indemnity proved as in The Isla de Panay and the Higgins and Kerlew cases, but such letters I regard as merely simplifying proof of facts which may be otherwise established, as by the boat notes here. Cf. Martineaus, Ltd., v. R. M. S. P. Co., Ltd., 17 Com. Cas. 176, 178, 179.

Here we have not a situation where the Italian shippers are the agents of the American consignees, but where the Italians are the sellers of a commodity and the Americans are the buyers—a relationship in which the parties are at arm's length. Cf. Sears v. Wingate, 85 Mass (3 Allen) 103, 107.

Here, to emphasize the attitude to which reference has just been made, the sales contracts provided that "the responsibility of the seller ceases after obtaining clean receipt from carrier."

Leaving outside of our discussion the question whether the seller-shipper of goods can implement his contract of sale by securing a false clean receipt from the carrier, I think it is quite clear, under the authorities above discussed, that a shipowner, who has issued a bill of lading containing false recitals on the strength of which a purchaser has parted with his money or pledged his

credit, cannot be allowed to say: "I am not liable for the damage because it occurred before the goods came into my custody."

It matters not, I think, that the bill of lading is not negotiable. For what difference can it make whether the steamship owner issues a document which it may reasonably expect will be acted on to his detriment by a particular man or by many men— by a man whose name it knows or by men whose names it knows not?

The real question involved in a case like this is whether the consignee of a straight bill of lading or the indorsee of a negotiable bill of lading knows, when he pays his money or pledges his credit, that the representation as to the condition of the goods by the shipowner is false. If he does not know· of the misrepresentation, the shipowner must stand by his statement of condition.

■ When a shipowner in a foreign port issues to a shipper a bill of lading in which the condition of the goods is falsely described there always arises a suspicion of connivance, but whether there be connivance or not does not matter, for, as Judge Putnam well said in the case of Pollard et al. v. Reardon (C. C. A.) 65 F. 848, at page 852:

"On the whole, the legal principles applicable seem clear, and, if the case involves any obscurity, we think it is because those principles have not been freely stated or applied. In the developments of commerce and commercial credits the bill of lading has come to represent the property, but with greater facility of negotiation, transfer, and delivery than the property itself. It is a negotiable instrument, even though not·in the same sense as promissory notes or bills of exchange. It carries on its face, in the words 'and assigns,' an authority to dispose of it, and, as we have seen, a like authority when indorsed in blank, by which the person who voluntarily puts it out, or permits it to be put out, ought to be estopped. And it has become so universal and necessary a factor in mercantile credits that the law should make good what the bill of lading thus holds out. There is every reason found in the law of equitable estoppel and in sound public policy for holding, and no injustice is involved in holding, that, if one of two must suffer, it should be he who voluntarily puts out of his hands an assignable bill of lading, rather than he who innocently advances value thereon."

To the same effect also is Munroe et al.

v. Philadelphia Warehouse Co. (C. C.) 75 F. 545, 547.

The instant case, therefore, comes down to the naked question whether shipowners should be allowed to launch without risk into the current of international trade bills of lading containing false statements, which they know, or must be presumed to know, will be the basis of the payment of money or the pledging of credit by some purchaser of the goods of which they are carriers.

■ A bill of lading is a document of dignity, and courts should do everything in their power to preserve its integrity in international trade for there, especially, confidence is of the essence.

How far a court will go nowadays in this direction is well illustrated by the case of Evans v. James Webster & Bro., Ltd., 32 Lloyds List Reports, 218 (1928), referred to above, in which Justice Wright held that as between the representation of condition of goods in a bill of lading and a protest regarding the condition by the master, the consignee was entitled to rely on the bill of lading.

It is also perhaps noteworthy that our attitude in this country towards bills of lading is changing and fast becoming better adapted to the actualities of modern commerce than formerly.

This is evidenced both by decisions and legislation. For example of the one, see Gleason v. Railway Co., 278 U. S. 349, 357, 49 S. Ct. 161, 73 L. Ed. 415, in which a railroad was held liable on a forged bill of lading and an earlier· decision by the Supreme Court of contrary tenor was overruled, and, for an example of the other, see the Federal Bill of Lading Act (49 USCA §§ 41–124 inclusive).

Unfortunately that act does not apply to a situation such as we have here in which bills of lading were issued in a foreign country. Cf. Poor on Charter Parties and Ocean Bills of Lading (2d Ed.) § 60, p. 127. If it did apply here, this opinion would have been unnecessary, because it is provided (49 USCA § 102), as follows:

"*Liability for nonreceipt or misdescription of goods.* That if a bill of lading has been issued by a carrier or on his behalf by an agent or employee the scope of whose actual or apparent authority includes the receiving of goods and issuing bills of lading therefor for transportation in commerce among the several States and with foreign nations, the carrier shall be liable to (a)

the owner of goods covered by a straight bill subject to existing right of stoppage in transitu or (b) the holder of an order bill, who has given value in good faith, relying upon the description therein of the goods, for damages caused by the nonreceipt by the carrier of all or part of the goods or their failure to correspond with the description thereof in the bill at the time of its issue."

■ V. The fact that, after the drafts were accepted but before they were paid, the buyer-consignees learned of the damage but nevertheless paid the drafts, does not in any way vitiate the estoppel in this case.

Payment of the drafts could not have been resisted if they had fallen into the hands of innocent purchasers for value. If they remained, as some of them apparently did, in the hands of the correspondent here for the sellers' Italian bank, payment could only have been resisted, if at all, by showing affirmatively that the sellers had delivered the goods damaged to the steamship company contrary to the recitals of the bills of lading. Certainly the buyer-consignees were not called on to engage in a litigation involving such difficulties of proof and at the same time possibly damage their credits by dishonoring their paper. Cf. Mr. Justice Scrutton's remarks in Martineaus v. R. M. S. P. Co., Ltd., 17 Com. Cas. 176, at page 180.

■ VI. I am told that the cause of action which the consignees may have here cannot be maintainable in admiralty because it is for a tort (deceit) committed on land.

My answer is that the suits are brought here on maritime contracts, namely, ocean bills of lading, and that the libelants here have made out a prima façie case against the steamship and her owner which the steamship owner is unable to meet because it does not come into court with clean hands. Cf. Mr. Justice Miller's views in the false warehouse receipt case, McNeil v. Hill, Woolw. 96, 16 Fed. Cas. page 325, No. 8914.

■ VII. The notice of claim clause is not available to the shipowner in this case under the decisions involving situations similar to this.

In Higgins et al. v. Anglo-Algerian S. S. Co., Ltd. (C. C. A. 2, 1918) 248 F. 386, at page 389, Judge Ward said:

"The case of The Persiana, 185 F. 396, 107 C. C. A. 416, is relied on as authority for holding that there can be no recovery, at least in connection with the 1,665 cases which were removed from the carrier's possession before notice of claim was given. Though courts of admiralty are not courts of equity, and may not be able to give affirmative relief in the case of contracts induced by preliminary fraudulent representations (Williams v. Insurance Co. [D. C.] 56 F. 159), still they do proceed upon equitable principles and may prevent a party from taking advantage of his own fraud in the contract itself. Pew v. Laughlin (D. C.) 3 F. 39, The Hero (D. C.) 6 F. 526, and The Electron (D. C.) 48 F. 689 are examples. To give the carrier the benefit of this exception would be to enable it to protect itself against the consequences of its own fraud."

To the same effect is The Kerlew (D. C.) 43 F.(2d) 732, 1924 A. M. C. 560, at page 568.

I put my decision in respect of the notice clause, however, on the ground that it is invalid, because to comply with it, it requires three steps, of which the first is unreasonable.

The clause with its relevant portions italicized is as follows:

"17. Claims.—*With respect to claims for loss, damage or non-delivery of cargo and for which under the terms hereof the Carriers may be liable,* it is also mutually agreed that the value of each freight paying unit shipped hereunder does not exceed $100,—on which basis the freight is adjusted, and the Carrier's liability shall in no case exceed that sum unless a value in excess thereof is specially declared in writing and a special shipment order be applied for and granted before shipment and such excess value be stated herein and extra freight as may be agreed on paid, the Carriers not being liable to a greater amount than such declared value which value is not in excess of the invoice value at port and time of shipment, *nor responsible for any claims, notice of which is not given before the removal of the goods from ship's deck. Notice of any claim arising under this Bill of Lading must be given in writing by the Consignees to the Agents of the Ship at the Port of Destination within 48 hours after the landing of or failure of the Carriers to deliver said goods.* When the goods are not delivered the time for giving notice shall commence from the date of departure from the port of destination of the ship purported to have carried said goods, and *all claims must be presented within two*

*months from the date of arrival of the ship at destination,* and further no suit or proceeding to recover for any such claim or demand shall be maintained against the carriers unless such action is commenced within twelve months after failing of such notice of claim, notwithstanding the defendant is a non-resident or foreign corporation, and *these limitations as to notice and suit can be waived only by an officer of the Steamship Company or by its General Agents in writing.*"

In contending that clause 22 of the bills of lading incorporating the British Sea Carriage of Goods Act, 1924, was not in conflict with the notice of claim clause, No. 17, counsel for the steamship and its owner says:

"But, even if there were any conflict, the bill of lading claim clause would govern since it deals in such detail with the manner of presentation of the various things to be done, first, the notice of damage [1] before removal of the goods from the deck; second, written notice of claim within forty-eight hours after the landing of the merchandise; and, third, presentation of the claim itself within two months from the filing of the notice of claim."

This argument by respondents' counsel recognizes unconsciously the undoubted fact that a notice of claim clause must be considered as an entirety and so judged as to its reasonableness. The Westminster, 127 F. 680, 682 (C. C. A. 3).

Notice either of damage or of claim before "removal of the goods from the ship's deck" is an unreasonable requirement because it involves a practical impossibility; for nowadays goods are usually not placed on the ship's deck at least for an appreciable time. Cf. The St. Hubert, 107 F. 727, 734 (C. C. A. 3); The Westminster, 127 F. 680, 682 (C. C. A. 3).

This disposes of the technical objection to a recovery in respect of the goods not marked as damaged in the two boat notes above mentioned, and, I think, rationalizes the situation regarding the cases marked as in bad condition in the boat notes. For if the claims of the libels be based, as they must be under the estoppel theory, on the validity and enforceability of the bills of lading, it is somewhat difficult to see why a valid notice clause would not be available as a defense if the consignee did not meet its requirements. Failure to do so, it must be remembered, is not a consequence of the shipowner's

---

[1] The clause, be it noted, says "claim."

fraud, but of the consignee's negligence or inattention.

In view of the foregoing, it becomes unnecessary to consider the effect of clause 22 of the bills of lading which incorporates the British Carriage of Goods by Sea Act, 1924, and the interesting implications which might arise therefrom.

VIII. Interlocutory decrees providing for reference on damages and carrying costs to the libelants may be presented on three days' notice.