Morris **FREEDMAN** and Noah **Freedman, doing business as Freedman Bros., Libelants-Appellees,**

v.

**THE m/s CONCORDIA STAR,** her engines, boilers, etc., **Skipsaksjeselskapet Samuel Bakke, and Boise-Griffin Steamship Co., Inc., Respondents-Appellants.**

**No. 51, Docket 24620.**

United States Court of Appeals
Second Circuit.

Argued Nov. 8, 1957.

Decided Jan. 16, 1958.

Haight, Gardner, Poor & Havens, New York City, Proctors for Appellant, Tallman Bissell and Francis V. Elias, New York City, of counsel.

Rothstein & Korzenik, New York City, Proctors for Appellees, Samuel Rothstein and Henry M. Cohn, New York City, of counsel.

Before SWAN, MEDINA and WATERMAN, Circuit Judges.

SWAN, Circuit Judge.

This is an appeal from an interlocutory decree in a libel for cargo damage brought by a partnership doing business as Freedman Bros. against the motorship Concordia Star, its owner, a Norwegian corporation named Skipsaksjeselskapet Samuel Bakke, and the owner's agent in New York. The decree dismissed the libel as against the New York agent, held the owner liable to the libelants, and referred the cause to a commissioner to report as to the damages sustained. The shipowner has appealed.

The trial judge made findings of fact and wrote an opinion. Freedman v. The Concordia Star, D.C., 147 F.Supp. 537, 538. The cargo involved was 121 barrels of pickled skins, consigned to Iran Overseas Corporation in New York and transported from a port in Iran to the port of New York in the summer of 1953. The ship had issued two clean bills of lading covering the 121 barrels and acknowledging receipt thereof "in apparent good order and condition." The court found that the barrels were properly stowed and protected throughout the voyage; that the barrels were outturned at Pier 3, Hoboken, N. J. "not in good order and condition"; and that the "damage to the contents of the barrels is reasonably attributable to the bad order and condition of the barrels at outturn." It was the contention of the shipowner that the damage to the skins resulted from the poor condition of the barrels before they were put on board. The chief mate testified by deposition that they were stained, with loose staves, and bottom and top partly loose, and he translated an entry in the log book to that effect. He also said that when he saw them at the outturn their condition was the same as when they were loaded. Captain Stave, a marine surveyor who boarded the vessel after her arrival in New York, testified that the barrels were well stowed but were stained, with staves broken and a number with heads pushed in. Mr. George Howard, an expert on skins who testified on behalf of the libelants, in response to a question as to the cause of the damage expressed the opinion that "the shipment was exposed to the elements prior to loading on the carrying vessel." But the trial court held that the shipowner was estopped to show that the barrels were received in the same poor condition as found at discharge. He found that while the ship was at sea the libelants "in the ordinary course of trade and in reliance on the representation of good order and condition in the bills of lading, of which it [sic] then received duplicates, purchased the goods therein identified." The sole question presented by the appeal is whether the court committed error in applying the doctrine of estoppel on the facts disclosed by the record.

An estoppel in pais operates in favor of a person who has been misled;[1] and the party invoking the principle of estoppel has the burden of proving that he has acted to his detriment in reliance upon what the other party had done.[2] The appellant contends that the libelants failed to prove that they suffered any detriment in reliance on the duplicate bills of lading. We agree.

The libel alleged that the consignee "sold said skins upon their arrival in New York to the libelants." At the trial, however, Mr. Noah Freedman testified in direct examination that he purchased the merchandise covered by the bills of lading from the consignee before it arrived in New York and after having been shown the duplicate bills of lading. But on cross-examination, when asked whether he bought the bills of lading, he replied "I bought the skins." He also testified on direct examination that after examining the skins with Mr. Posen, who represented the Iran Overseas Corporation, he turned to Mr. Posen and told him: "I can't accept the skins in this condition. I bought sound skins." He paid the consignee by check dated October 2, 1953, which was several days after he had examined the skins at the pier and knew of their damaged condition. No written contract between Freedman Bros. and Iran Overseas Corporation was put in evidence and, if the contract was oral, no testimony was presented as to its terms. The district court's opinion states, at 147 F.Supp. 539: "Libelants considered themselves bound to the consignee and 'were not called on to engage in a litigation involving such difficulties of proof and at the same time possibly damage their credits by dishonoring' their reputation in the skin market." This statement was supported by a footnote citing Judge Woolsey's opinion in The Carso, D.C.S.D.N.Y., 43 F.2d 736, at page 745. But it is significant that in The Carso the libelants had accepted drafts in reliance on the bills of lading before learning of the damage to the goods, although the drafts were not actually paid until afterward. Similarly, making advances or giving a note in reliance upon the bill of lading are established grounds for estoppel.[3] But the case at bar is very different. So far as appears Freedman Bros. had parted with nothing in reliance on the duplicate bills of lading. As Mr. Freedman's statement to Mr. Posen, above quoted, indicates he considered himself at liberty to reject the damaged skins because "I bought sound skins." In our opinion the district court's suggestion that the libelants might damage their credit by "dishonoring their reputation in the skin market" is not supported by the record and extends the law of estoppel beyond the established authorities.

Accordingly the interlocutory decree is reversed and the case is remanded with directions to dismiss the libel as against the shipowner as well as against its New York agent.

1. Ketchum v. Duncan, 96 U.S. 659, 666, 24 L.Ed. 868; Columbia Ins. Co. of New Jersey v. Mart Waterman Co., 2 Cir., 11 F.2d 216, 218.

2. Helvering v. Schine Chain Theatres, 2 Cir., 121 F.2d 948, 950; Commissioner of Internal Revenue v. Union Pacific R. Co., 2 Cir., 86 F.2d 637, 640; The Carso, D.C.S.D.N.Y., 43 F.2d 736, which contains an excellent discussion by Judge Woolsey of the history of the growth of the principle of estoppel as applied in recitals in ocean bills of lading. On appeal Judge Woolsey's decision was reversed in part, The Carso, 2 Cir., 53 F.2d 374, certiorari denied Navigazione Libera Trustina v. Molinelli Giannusa & Rao, Inc., 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 574, but the validity of his discussion of the principle of estoppel was unimpaired. See also Olivier Straw Goods Corp. v. Osaka Shosen Kaisha, 2 Cir., 27 F.2d 129, 133.

3. Bradstreet v. Heran, 3 Fed.Cas. page 1183, No. 1,1792a, and Sears v. Wingate, 85 Mass. 103; The Kerlew, D.C.S.D. N.Y., 43 F.2d 732.